WORCESTER-TATNUCK SQUARE CVS, INC. *vs.* LEWIS
KAPLAN.

No. 91-P-522.

Worcester. September 18, 1992. - November 2, 1992.

Present: FINE, GILLERMAN, & GREENBERG, JJ.

*Landlord and Tenant*, Percentage lease, Subletting, Relocation of tenant,
Consumer protection.

A Superior Court judge correctly determined that a long-term commercial
lease did not contain an implied covenant that the tenant would remain
in business at the site, where there was no evidence that the parties
intended to provide for such an undertaking by the tenant and the lack
of such a provision in the lease was evidence there was no such under-
standing. [502-503]
A commercial landlord did not unreasonably withhold his consent to a sub-
lease of the premises by the tenant, where percentage rent payments
were contemplated over the long term of the lease, where the landlord
could reasonably insist on a subtenancy that would be likely to generate
at least a reasonable amount of percentage rent, and where the tenant
gave no information to the landlord to indicate that the proposed sub-
lease of half the space would produce any percentage rent or how the
remaining space would be used. [503-506]
The judge in a civil action was warranted in finding that a commercial
tenant had violated G. L. c. 93A, in its dealings with its landlord, and
he also correctly found that the violation had caused the landlord no
substantial harm. [506]

CIVIL ACTION commenced in the Superior Court Depart-
ment on April 5, 1989.

The case was heard by *James P. Donohue*, J.

*Charles B. Swartwood, III*, for the plaintiff.

*Michael J. Michaeles* for the defendant.

FINE, J. This appeal concerns the obligations of parties to a
long-term commercial lease for a retail store, percentage rent
being an important feature, when the tenant, for business
reasons, seeks to relocate during the course of the lease term.

The tenant, Worcester-Tatnuck Square CVS, Inc. (CVS), brought an action seeking a declaration that the landlord, Lewis Kaplan, acted unreasonably in withholding his consent to a sublet. Kaplan counterclaimed seeking damages and injunctive relief based upon CVS's alleged breach of the lease in failing to remain in business at the site. Kaplan also sought G. L. c. 93A damages because of certain allegedly deceptive conduct on CVS's part.

After a jury-waived trial, a Superior Court judge found that CVS's failure to remain in business at the site was not a breach of the lease and that Kaplan had not acted unreasonably in refusing to consent to the sublease. He also found no c. 93A violation. Both parties appealed. We affirm.

We summarize the judge's findings insofar as they are material to the issues raised on appeal. Until 1976, Kaplan operated a food market in the premises which he owned in Worcester. On August 23, 1976, he and CVS signed a lease of the premises after negotiations during which both parties were represented by counsel. The lease provided for an initial seven-year term, with options for CVS to extend for three additional five-year periods. Initially, the base rent was $30,000 annually, and it was to increase by a fixed amount each time CVS exercised its option to extend. The base rent at the time of the trial in 1990 was $38,500. In addition, CVS was to pay a percentage rent based upon gross sales over a specified amount. There was no express requirement in the lease that CVS continue to operate its business at the site throughout the term of the lease.

The lease provided that CVS had the right to sublet all or part of the premises so long as Kaplan consented in writing. Kaplan, however, could not unreasonably withhold his consent. Compare *21 Merchants Row Corp.* v. *Merchants Row, Inc.*, 412 Mass. 204 (1992). In the event of a sublet, CVS would remain liable for all of the "tenant's covenants," and the subtenant would be required to report its gross sales so that the percentage rent due, if any, could be calculated.

During the first three years of the lease term, no percentage rent payments were made. In 1982, CVS acquired the

Lincoln Pharmacy, which had been located in a mall a few blocks from the premises, and most of that pharmacy's business was moved to the CVS store. As a result, the percentage rent payable by CVS to Kaplan increased, and thereafter continued to increase so that by 1987 the percentage rent amounted to $59,412.50.

In 1987, a large rental unit became available in the mall a few blocks from the premises, and CVS was faced with the possibility that the space would be occupied by a competitor. Without informing Kaplan, CVS made a decision in late 1987 to vacate the Kaplan premises and move the CVS operation to the mall, and in February of 1988 CVS signed a lease for the mall space. CVS and Kaplan engaged in fruitless discussions of a buyout in April of 1988, CVS having told Kaplan that there was a possibility that CVS might move. On June 8, 1988, still without informing Kaplan of the mall lease, CVS exercised its second option to extend the Kaplan lease for an additional five-year term. Five days later, CVS vacated the premises. Its purpose in extending the lease was to prevent occupation of the Kaplan premises by a competitor. CVS continued to pay the base rent, which was substantially below the market rental at the time.

CVS began to look for potential sublettors. Unable to interest any potential subtenant in the entire premises, it discussed rental of part of the space with several different businesses. In late 1988, CVS sent Kaplan a proposed sublease with Domino's Pizza for use of approximately half the space. The proposed lease provided for rental payments by Domino's Pizza to CVS in an amount almost three times CVS's base rent per square foot under the prime lease, but no percentage rent. According to the terms of its lease with Kaplan, CVS would continue to be obligated to pay Kaplan the base rent provided for in that lease and, in addition, percentage rent based upon Domino's Pizza's gross sales.[1]

When asked to consent to the proposed sublease with Domino's Pizza, Kaplan declined. The principal reason given

---

[1]Given CVS's obligations under the Kaplan lease, however, the lower the subtenant's gross sales, the more favorable the arrangement to CVS.

by Kaplan in various oral and written communications was that there was no assurance that the percentage rent he would receive would be substantial. Indeed, he had been provided with no estimate of Domino's Pizza's anticipated gross sales. Other reasons mentioned by Kaplan for withholding his consent were that structural changes would be required to divide the space, and the proposed subtenant's business would create increased traffic hazards and require the use of ovens.

1. *Was there an implied covenant in the lease for CVS to continue to operate its business on the premises?* The lease in issue is in many respects a typical arrangement for rental of space for a retail business. In the interest of stability, the terms of such leases generally are lengthy, and percentage rents provide the landlord with a hedge against inflation. Both landlord and tenant, to a degree, share the risks of the tenant's business and the potential for profit. See *Haack* v. *Great Atl. & Pac. Tea Co.*, 603 S.W.2d 645, 649-650 (Mo. Ct. App. 1980). One sense in which the instant lease may *not* be typical is its failure to include an express undertaking by CVS to remain in business on the premises during the term of the lease. Kaplan argued, however, that the nature of the relationship and his reasonable expectations were such that a covenant to remain in business at the site should be implied. Relying on *Stop & Shop, Inc.* v. *Ganem*, 347 Mass. 697 (1964), the judge ruled that the lease did not contain such an implied covenant on CVS's part.

The *Stop & Shop* case holds as follows: the issue whether in such circumstances there is an implied covenant to continue operating on leased premises depends upon the intent of the parties at the time the lease is signed; the lessor has the burden of showing that the parties intended to include such a covenant; and one way a lessor may satisfy that burden is to show that the base rent was substantially below the market value at the time the lease was signed. *Id.* at 701-702. The only evidence in this case relating to the relationship between the base rent and the market value in 1976 was, first, that the rent Kaplan had been paying himself for

use of the premises was lower than the rent charged to CVS and, second, that other CVS leases signed around the same time called for equivalent or lower base rents. In the absence of a showing that the base rents were below market value when the lease began, or any other evidence that the parties intended to provide for an undertaking by CVS that it remain in business at the site, "[a]n omission to specify an agreement in a written lease is evidence that there was no such understanding." *Stop & Shop, Inc.* v. *Ganem*, 347 Mass. at 701. Compare *College Block* v. *Atlantic Richfield Co.*, 206 Cal. App. 3d 1376 (1988). Contrast *Joffe* v. *Sears, Roebuck & Co.*, 31 Ohio App. 3d 243 (1986).

Kaplan would distinguish the *Stop & Shop* case on the ground that the percentage rent lease in that case did not set forth the purpose for which the premises were to be used, whereas the instant lease does. The court in the *Stop & Shop* case mentioned the absence of such a clause in its discussion of the facts but noted that the lessor knew when the lease was signed that the tenant was engaged in the supermarket business. *Id.* at 700. Nothing in the court's opinion indicated that the issue would turn on the inclusion or exclusion of such language in the lease.

2. *Did Kaplan act unreasonably in withholding his consent to the sublease?* "The words, 'which approval shall not be unreasonably withheld,' prescribe that the [lessor] shall act in accordance with usual standards of reasonableness." *Nassif* v. *Boston & Me. R.R.*, 340 Mass. 557, 565 (1966). Whether a lessor acts reasonably in withholding his consent to a sublease, therefore, is a question for the finder of fact. Compare *Adams, Harkness & Hill, Inc.* v. *Northeast Realty Corp.*, 361 Mass. 552, 557 (1972). See generally Annot., Lessor's Consent to Subletting, 54 A.L.R.3d 679 (1973). In a commercial context, only factors which relate to a landlord's interest in preserving the property or in having the terms of the prime lease performed should be considered. Among the factors properly considered are the financial responsibility of the subtenant, the legality and suitability of the proposed use, and the nature of the occupancy. A land-

lord's personal taste and convenience, on the other hand, are not factors properly considered. Restatement (Second) of Property, Landlord & Tenant § 15.2, Reporter's Note, item 7 (1976).

Based on the evidence, among other things, that Kaplan had no assurance that the Domino's Pizza sublease would produce any percentage rent, the trial judge found that Kaplan had acted reasonably in withholding his consent. We would not overturn such a finding of reasonableness unless clearly erroneous.

CVS contends on appeal that the finding of reasonableness here is inconsistent with the judge's ruling that there was no implied covenant on CVS's part to remain in business at the site. CVS reasons that because, first, CVS remained obligated to pay no more than the base rent, second, there was no evidence that Domino's Pizza was not financially responsible, and, third, the sublease would assure Kaplan of the continued receipt of the base rent from CVS, Kaplan had no reasonable basis for withholding his consent. Indeed, CVS notes, the rent CVS would pay Kaplan if the sublease should be approved might possibly exceed CVS's base rent under the prime lease should Domino's Pizza's gross sales reach the level required for percentage rent to be due under the prime lease. Expressed otherwise, CVS's argument is that Kaplan should not be allowed to withhold his consent in order to improve upon the terms of the prime lease.

That is a sound principle. "[I]t is unreasonable for a landlord to withhold consent to a sublease solely to extract an economic concession or to improve its economic position." *1010 Potomac Assocs.* v. *Grocery Mfrs. of America, Inc.*, 485 A.2d 199, 209-210 (D.C. 1984). See also *Kendall* v. *Ernest Pestana, Inc.*, 40 Cal. 3d 488, 501 (1985). Compare *Piccicuto* v. *Dwyer*, 32 Mass. App. Ct. 137, 138 (1992).

In the *1010 Potomac Assocs.* case, for example, the landlord sought unsuccessfully to condition his approval of a subtenant on his demand that the landlord split with the prime tenant the difference between what the subtenant would pay and the rent called for in the prime lease. There was also

evidence that the landlord had offered to deal directly with the subtenant for the property, thereby essentially admitting that the subtenant was an acceptable tenant. The underlying assumption of the decision that the landlord acted unreasonably is that a tenant who signs a long-term lease for a fixed rent is entitled to the benefit of any increase in the market value of the premises over the course of the lease term. That is certainly correct as a general proposition. Because a percentage rent lease was not involved, however, the *1010 Potomac Assocs.* case is distinguishable from the instant case. Here, from the outset, the agreement between Kaplan and CVS was for a long-term retail lease, and percentage rent payments over the course of time were contemplated by the parties. Essential to Kaplan's original bargain was the nature of the tenancy, operation of a potentially high-volume retail business, and the expectation over time of receiving percentage rent. CVS cannot now complain if Kaplan chooses to preserve that expectation.

It is true that no percentage rent was paid during the first three years of the lease term and that, as a result of the acquisition of a competing pharmacy in 1982, the volume of CVS's business may have exceeded Kaplan's expectations. Kaplan could not reasonably insist, therefore, on a subtenant with gross sales equal to CVS's. However, Kaplan had a vital interest in the anticipated gross sales any prospective subtenant would be likely to generate, and he could reasonably insist upon a subtenancy that would be likely to generate at least a reasonable amount of percentage rent.

In the circumstances, we think the judge was warranted in finding that Kaplan exercised reasonable business judgment in rejecting the particular subtenancy offered. Accord *Haack v. Great Atl. & Pac. Tea Co.*, 603 S.W.2d at 651. It was particularly significant that no information was given to Kaplan about the anticipated level of Domino's Pizza's gross sales. Moreover, only half the premises were to be occupied by Domino's Pizza, and there was no assurance that the remaining space would be used to generate sales that might result in percentage rent.

Because we conclude that the trial judge was warranted in finding that Kaplan acted reasonably in withholding his consent for the reason we have discussed, we need not reach the question whether either the structural work required to divide the space, the increased risk to the property from the use of ovens, or the increase in traffic would have been separate reasonable grounds for Kaplan to withhold his consent.

3. *Did CVS violate G. L. c. 93A?* CVS engaged in deceptive conduct. It indicated to Kaplan that it *might* move when a firm decision to that effect had been made. It did not inform Kaplan that it had signed a lease for other space before it exercised its option to extend the lease, and it moved without informing Kaplan. The judge was warranted in finding, however, that, because Kaplan could do nothing to prevent CVS from exercising its right under the lease to extend the term and continue to pay only the base rent, the deception caused Kaplan no substantial injury. See *Kohl* v. *Silver Lake Motors, Inc.*, 369 Mass. 795, 800 (1976); *Martha's Vineyard Auto Village, Inc.* v. *Newman*, 30 Mass. App. Ct. 363, 368 (1991).

*Judgment affirmed.*