WORCESTER REDEVELOPMENT AUTHORITY *vs.* DEPARTMENT
OF HOUSING AND COMMUNITY DEVELOPMENT; MARR OIL
HEAT CO., INC., intervener.[1]

No. 97-P-1955.

Suffolk. December 11, 1998. - August 4, 1999.

Present: KASS, DREBEN, & SPINA, JJ.

*Real Property,* Relocation payments. *Personal Property,* Attachment to real
estate. *Landlord and Tenant,* Eminent domain, Fixture.

Substantial evidence supported a decision of the bureau of relocation of the
Department of Housing and Community Development that oil storage
tanks and related equipment located on land taken by eminent domain
were the personal property of the tenant and that, consequently, the tenant
was entitled to relocation compensation under G. L. c. 79A. [529-532]

CIVIL ACTION commenced in the Superior Court Department on
July 3, 1996.

The case was heard by *Allan van Gestel,* J., on a motion for
judgment on the pleadings.

*Seth D. Jaffe* for the plaintiff.

*Kathryn B. Palmer* for the defendant.

KASS, J. At the time real estate between Charles Street and
Howard Street in Worcester (locus) was taken by eminent
domain, there were on it oil storage tanks above and below the
ground, together with pumps, valves, meters, and connecting
pipes. The question in dispute is whether that equipage was part
of the real estate or was personal property belonging to a tenant
who, if that were so, was entitled to relocation compensation
under G. L. c. 79A. We decide, as did the State Department of
Housing and Community Development and a judge of the
Superior Court, that the tenant owned the storage tanks and

[1]Marr Oil Heat Co., Inc., did not file a brief.

related equipment and was, therefore, entitled to relocation payments.[2]

1. *Facts and prior proceedings.* Marr Oil Heat Co., Inc. (Marr Oil), had begun doing business on the site starting in 1949, distributing fuel oil and storing it in bulk. The ability to store oil in bulk was valuable to Marr Oil because it could buy oil when the market was down, thereby enabling it to sell at competitive prices when the market spiked. The principals of Marr Oil were members of the Germain family: Andrew A. Germain, the first president; Andrew F. (Buddy) Germain, his son; and, later, Joseph and Darren Germain, grandsons.[3] When the Germains bought the business, there were five oil tanks located on the property, with an aggregate capacity of 34,000 gallons. Over time, the Germain family added seven additional tanks (three of them underground) with an additional capacity of 101,000 gallons.

In 1959, Marr Oil conveyed the locus to Marr Realty Corporation, of which Andrew A. Germain was then the controlling stockholder. Later, the controlling stock in Marr Realty Corp. devolved upon Andrew's son, Buddy. In 1988, Marr conveyed the locus to Buddy Germain, who owned it on September 24, 1993, when the Worcester Redevelopment Authority (WRA) took the locus by eminent domain for the Medical City urban renewal project. Marr Oil took its claim for relocation compensation concerning the tanks and related equipment in the first instance to WRA. The position adopted by WRA, after proceedings before its board of relocation appeals, was that the tanks and equipment were part of the real estate and that, indeed, if Marr Oil received relocation payments in the form of the loss attendant on not being able to use personal property as a result of moving, the WRA would be paying for the tanks and equipment twice.

At the time of the taking, Buddy Germain was president and the dominant officer of both Marr Oil and Marr Realty. As will appear more fully in discussion of the evidence, lines of opera-

---

[2]The administrative proceedings under review were before the bureau of relocation of the Department of Housing and Community Development. At the time of the proceedings before the bureau of relocation, it was known as the Executive Office of Communities and Development. The change of nomenclature and organization was effected by St. 1996, c. 151, § 124.

[3]The source of the name of Marr Oil is Peter J. Marrone, the proprietor of the business who sold it in 1949 to Andrew A. Germain.

tion by the two companies often ran together. Marr Oil would buy an oil tank, apply for the necessary license for storage of inflammables and plant it on or in the real estate. Marr Realty paid real estate tax bills which included fuel tanks as part of the description of the real estate. When it came to move the business from the locus, Marr Oil moved only the distribution and not the bulk storage components to a location in Auburn. (One gathers the new site, either by reason of limitations of size or licensure, did not accommodate the bulk storage tanks). The record does not make clear whether some of the smaller tanks were part of the distribution components and whether they were, in fact, moved to Auburn.

Conformably with the penultimate paragraph of G. L. c. 79A, § 7, Marr Oil sought review from the bureau of relocation of the Department of Housing and Community Development (bureau). The bureau decided that "the property in question qualifies as personal property as that term is defined in [G. L. c. 79A] and the regulations promulgated thereunder, and that relocation payments should be made [to Marr Oil] accordingly. This will require that the real estate appraisals be revised to reflect the fact that the personal property will no longer be included in the appraisal." WRA sought review in Superior Court under G. L. c. 30A, § 14. A judge of that court, acting on WRA's motion for judgment on the pleadings, Mass.R.Civ.P. 12(c), 365 Mass. 756 (1974), denied the motion and affirmed the decision of the bureau.[4]

2. *Statutory background.* Chapter 79A of the General Laws has as its purpose "to provide for the fair and equitable treatment of all persons displaced as a result of public action." 760 Code Mass. Regs. § 27.01(1) (1978).[5] Although insertion of

---

[4]The bureau acted on behalf of the Department of Housing and Community Development (department). The department's answer, in accordance with G. L. c. 30A, § 14(4), was a certified copy of the administrative proceedings under review. General Laws c. 79A, § 7, provides that disposition of a relocation claim by the bureau "shall be final." The department has not raised the questions whether that language restricts judicial review of relocation payment decisions or whether such a restriction would be constitutional. We express no view on those questions. Throughout this opinion we refer to the bureau as the decision maker, although the agency that is the decision-making authority and the party to this appeal is, of course, the department.

[5]The regulations governing relocation assistance applicable to Marr Oil's dislocation were replaced in their entirety on June 26, 1998, effective July 1, 1998.

c. 79A into the General Laws by St. 1965, c. 790, § 4, preceded by some six years enactment of a uniform relocation assistance statute by Congress, see 42 U.S.C. §§ 4601 et seq. (1990),[6] the policy of the bureau was that "all persons displaced by [S]tate and local public activity shall receive relocation assistance and payments commensurate with [F]ederal standards set forth in [the Federal act.]" 760 Code Mass. Regs. § 27.01(1). Read together, the Federal and State statutes evince a design to minimize the adverse impact of displacement by help to individual residents and, as well, businesses whose survival will buttress in turn the economic and social well-being of the communities in which they function.

As to those broad objectives there is no quarrel between the parties, although we think the bureau is correct in thinking that the articulated policy objectives of the statutes and regulations toward dislocated businesses tilt in favor of interpretation of statutory language that provides assistance to businesses so affected. The particular statutory language about which the parties contend appears in G. L. c. 79A, § 7, and requires that

> "Any agency . . . which acquires real property . . . shall make fair and reasonable relocation payments to displaced persons and businesses, upon proper application for: . . . 2. actual direct losses of tangible personal property as a result of moving or discontinuing a business . . . , but not to exceed an amount equal to the reasonable expenses that would have been required to relocate such property, as determined by the relocation agency."[7]

"Personal property" is defined in § 1 of c. 79A as:

> "(a) tangible property situated on the real property vacated or to be vacated by a displaced person and which is considered personal property and is non-compensable as real property, and (b) in the case of a tenant, fixtures and equipment, and other property which may be characterized as real property under state or local law, but which the

---

[6]The title of the Federal statute is "Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970." That statute was substantially amended in 1987.

[7]Section 1 of c. 79A, captioned "Definitions," defines "[r]elocation payment" as including payment for the "actual direct loss of tangible personal property," without any upset amount.

tenant may lawfully, and at his election, determines to move and for which the tenant is not compensated in the real property acquisition." G. L. c. 79A, § 1, as amended by St. 1973, c. 863, § 1.

That gets us to the heart of the matter: was Marr Oil entitled to move the tanks and equipment?

3. *Discussion.* The language of G. L. c. 79A, § 1(b), suggests that relocation agencies ought not to be over-enthralled with traditional notions of what is a fixture on the real estate and what is a moveable that belongs to a tenant. On analysis, the understood principles regarding fixtures, i.e., permanent improvements to real estate, serve perfectly well for analyzing the problem at hand. Property attached to real estate may be removed by a tenant if that can be done without material injury to the real estate and if, in the process of removal, the property taken away does not lose its essential character or value. *Hanrahan* v. *O'Reilly*, 102 Mass. 201, 203 (1869). *Consiglio* v. *Carey*, 12 Mass. App. Ct. 135, 138-139 (1981). *Southern Massachusetts Broadcasters, Inc.* v. *Duchaine*, 26 Mass. App. Ct. 497, 499 (1988). Bloom et al., Lease Drafting in Massachusetts § 7.76 (MCLE 1996). Restatement (Second) of Property, Landlord and Tenants §§ 12.2(4)&(5) (1977). When, as here, the accessions to real estate can be removed without material harm to the real property to which they are attached and in such fashion so that they retain their identity, the intent of the parties becomes a factor. The bias is toward the tenant's right of removal unless the parties by action, speech, or writing (e.g., a lease) have demonstrated a different intent; i.e., the intent of the parties, if it can be ascertained, governs. *Wall* v. *Hinds*, 4 Gray 256, 270-271 (1855). *Howard* v. *Fessenden*, 14 Allen 124, 128 (1867). Schwartz, Lease Drafting in Massachusetts § 7.45, at 349 (1961). See *Rite Media* v. *Secretary of the Massachusetts Highway Dept.*, 429 Mass. 814, 816-817 (1999), in which the court, taking note of G. L. c. 79A, § 1, describes a billboard sunk into concrete footings as personal property of the tenant which leased the location. Contrast *Newman* v. *Commonwealth*, 336 Mass. 444, 446-448 (1957), in which the character of tenant's gas station facilities (including tanks and pumps) as real estate improvements was assumed by the parties and by the court. The *Newman* opinion was also written before the enactment of G. L. c. 79A. For cases in which oil tanks and associated equipment were determined to be trade fixtures removable

from land, see *Shell Oil Co.* v. *Capparelli,* 648 F. Supp. 1052, 1055 (S.D.N.Y. 1986); *Sgro* v. *Getty Petroleum Corp.,* 854 F. Supp. 1164, 1180 (D.N.J. 1994); *Moffat* v. *White,* 203 Minn. 47, 51-55 (1938); *Ilderton Oil Co.* v. *Riggs,* 13 N.C. App. 547, 549-550 (1972); *Standard Oil Co.* v. *LaCrosse Super Auto Serv.,* 217 Wis. 237, 244-245 (1935). Contrast *Young* v. *Iowa,* 490 N.W.2d 554, 555-556 (Iowa 1992) (oil tanks buried under cement).

WRA argues that the bureau could not conscientiously have determined that Marr Oil, as tenant, and Marr Realty or Buddy Germain, as landlord, intended that the tanks were to be regarded as tenant property susceptible of being moved. To maintain that position, WRA argues that it is not enough that there is some evidence to support the bureau's decision. In reviewing to see if there is substantial evidence for the conclusion that the tanks, etc., are personal property that Marr Oil may move, WRA asks us not to look at abstracted items of evidence, but to examine the whole record and to look at the evidence contextually. See Jaffe, Judicial Control of Administrative Action 600-602 (1965). We are quite prepared to do so as that is consistent with the standard for testing whether substantial evidence supports administrative agency findings as described in cases such as *New Boston Garden Corp.* v. *Assessors of Boston,* 383 Mass. 456, 466, 473-474 & n.11 (1981), and *Pyfrom* v. *Commissioner of the Dept. of Pub. Welfare,* 39 Mass. App. Ct. 621, 624-625 (1996). The approach of the reviewing court to the agency determinations is one of deference and restraint, but not abdication. *Armone* v. *Commissioner of the Dept. of Social Serv.,* 43 Mass. App. Ct. 33, 34 (1997).

For the propositions that Marr Oil was a tenant, and that the tanks were moveables that the tenant might relocate, there was evidence that, beginning in 1987, Marr Oil paid rent of $1,000 per month first to Marr Realty and then to Buddy Germain when the locus was transferred to him in 1988. The financial statements of Marr Oil reflected rent payments for the real estate. There was testimony from Darren and Joseph that there was a landlord-tenant relationship. That testimony was self-serving but such evidence is not valueless, and it was for the fact finder to decide how much to credit it.

As to the tanks, licenses for the inflammables stored in them were issued to Marr Oil. That, assuredly, is not conclusive of who owns the tanks because, as WRA is quick to point out, a

user-tenant might pay for license fees attendant to the use of tanks the user might lease and not own. That Marr Oil had a proprietary interest in the tanks, however, was a permissible inference. Marr Oil substantially paid for the installation of the tanks and equipment, particularly the later, capacious additions. It installed those tanks in such fashion that they might be dismantled and moved. Marr Oil paid permitting fees in connection with the tanks; it paid personal property taxes in connection with the business, a fact from which the bureau hearing examiner reasonably inferred that this included the tanks; it paid to maintain the tanks. There was evidence from an expert witness that the tanks were installed so that they could be dismantled and moved. There was testimony from Darren and Joseph that the family thought of the tanks as moveable assets of Marr Oil, and that they had made plans to move them.

As evidence of its position that the tanks were part of the real estate, WRA offered the inclusion of the tanks and equipment as part of the real estate in the appraisals it had commissioned in connection with the taking and the failure of Buddy Germain to protest the inclusion of the tanks as real estate.[8] There was no evidence, however, that the appraisers had discussed ownership of the tanks with Buddy Germain. What WRA considers as the clincher is that in 1986, Marr Oil and Marr Realty filed a form entitled "Notification of Underground Storage Tanks" with the Worcester fire department and on that form Marr Realty claims ownership of the tanks. The bureau could, however, consider that document as one of several which showed confusion and informality between components of a family business.

The bureau could, on the whole record, decide that Marr Oil's storage and distribution business was separate from the real estate ownership. If so, under the policies of business assistance that inform application of the relocation statutes, the bureau could resolve the conflicting evidence as it did. The record includes the testimony of ten witnesses and sixty-eight exhibits. Within that record, there was substantial evidence to support the bureau's decision. As to WRA's warning that the

---

[8]Buddy Germain, who had died by the time of the hearings before the bureau, had brushed off generally the offer made by WRA for the real estate and returned WRA's check. His estate brought a land damage claim under G. L. c. 79. That action, at the time the appellate record closed, was pending. WRA had filed a counterclaim for remediation of oil pollution that reduced the damages it had offered for the taking to zero.

bureau's decision may require WRA to pay twice for the tanks, there are two answers: 1) the classification of the tanks made by WRA's appraisers cannot govern the rights of a tenant if the appraisers got it wrong; 2) WRA has long known in connection with the pending eminent domain case that the position of the Germain family is that the tanks and equipment are not included in the real estate. WRA has not been helpless to adjust its position, and as remarked above, was advised by the bureau so to do in 1996.

The reviewing Superior Court judge correctly determined that the bureau's decision stood on substantial evidence and that relocation payments were to be made in accordance with the agency decision.

*Judgment affirmed.*