Julie M. Chapman & others[1] *vs.* David L. Katz & others.[2]

Middlesex. November 6, 2006. - March 16, 2007.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, & Cordy, JJ.

*Contract,* Lease of real estate, Performance and breach, Termination. *Landlord and Tenant,* Termination of lease. *Consent. Consumer Protection Act,* Lease, Attorney's fees. *Words,* "Structure."

In a commercial lease dispute between the plaintiff owners of the property and the defendants (the tenant and his sublessee) concerning whether the erection of an automated teller machine (ATM) kiosk on the property required the consent of the owners, the judge properly permitted the jury to consider whether the ATM kiosk was a "structure" or a "trade fixture." [526-528]

In a commercial lease dispute between the plaintiff owners of the property and the defendants (the tenant and his sublessee), no facts existed to be resolved by the jury regarding whether the owners unreasonably withheld their consent to the erection of a structure (an automated teller machine) on the property, and therefore, the judge should have granted the defendants' motion for judgment notwithstanding the verdict in favor of the owners, where none of the reasons proffered by the owners for with-holding their consent provided a legally cognizable basis to withhold consent. [528-535]

The judge in a civil action arising from a commercial lease dispute correctly denied the plaintiffs' claims for damages for breach of contract, where the plaintiffs were entitled to no recovery on that claim [535-536]; further, the judge correctly denied the plaintiffs' claim for damages and attorney's fees under G. L. c. 93A, § 11, where the plaintiffs had suffered no injury or loss from the defendants' unfair or deceptive conduct [536-537].

Civil action commenced in the Superior Court Department on March 10, 1998.

The case was tried before *Linda E. Giles,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Philip Y. Brown (Timothy P. Frawley* with him) for the plaintiffs.

---

[1] Ann S. Webster and Carolyn Patti Mijares.

[2] The Camera Company, Inc., and Banknorth, N.A.

*Evans Huber* for Banknorth, N.A.

*Douglas G. Moxham* for David Katz & another.

MARSHALL, C.J. The central question in this commercial lease dispute between the plaintiff-owners and the defendant-tenant, David L. Katz,[3] and his sublessee, the defendant Banknorth, N.A. (bank),[4] is whether the bank's erection of an automated teller machine (ATM) kiosk on the property required the prior consent of the owners. The defendants contend that the consent of the owners was not required under the terms of the lease, and that if consent was required, it was unreasonably withheld in contravention of the lease terms.

The dispute concerns a long-term lease, sixty years in total if all options to extend are exercised by the tenant. The lease was entered into in 1974 by the mother of the present owners, her three daughters, on terms the daughters consider highly unfavorable. The mother conveyed the property to the daughters in 1989. The owners commenced the present action in 1998, alleging breach of the lease by the tenant, as well as violations of G. L. c. 93A, § 11, by the tenant and the bank. They also sought a declaratory judgment that the lease had terminated.

The case was tried before a jury, and in answer to special questions, they found that the owners had not unreasonably withheld their consent to erect the ATM kiosk, that the tenant had breached the lease, and that the tenant and the sublessee bank had wilfully committed unfair trade practices. The jury also found, however, that there was no resulting "injury or loss" on any claim. Consistent with the jury's answers to the special questions, the trial judge in the Superior Court entered a declaratory judgment ordering termination of the lease as of the date of judgment (Count I), an order that the owners reimburse the sublessee bank for the cost of substantial improvements the bank had made to the property and that no action be taken to evict the bank until that amount had been determined, an order entering judgment in favor of the tenant on the claim for dam-

---

[3]The Camera Company, Inc., is owned by David L. Katz. They are referred to collectively as the tenant or Katz.

[4]At the time of the sublease, the sublessee was MetroWest Bank. In 2001, MetroWest Bank was purchased by Banknorth, N.A. The sublessee is referred to throughout as the bank.

ages for breach of the lease (Count II), and an order entering judgment in favor of both defendants on the G. L. c. 93A claim (Count III), essentially because the jury found that the owners had suffered no damages. All parties appealed.

The Appeals Court reversed in part as to Count I. The lease required the tenant to seek the owners' permission before erecting a "building or structure" on the property. Focusing on whether the ATM kiosk is a "structure" or a "trade fixture," the Appeals Court concluded that the judge had erred in declining to rule "that the ATM kiosk was a trade fixture as matter of law." *Chapman* v. *Katz*, 65 Mass. App. Ct. 826, 828 (2006). In the view of the Appeals Court, because the ATM kiosk was a trade fixture as a matter of law, it could not be a "structure" as that term was used in the lease. *Id.* at 829. Accordingly, no consent of the owners was required to erect the ATM kiosk, there had been no breach of the lease, and the lease should not have been terminated by the judge. *Id.* at 831. The Appeals Court ordered that a new judgment enter declaring that the lease remain in full force and effect. It also affirmed the entry of judgment for the tenant on the breach of the lease claim (Count II), *id.* at 831 n.9, and against the owners on their claim for attorney's fees under G. L. c. 93A, § 11 (Count III). *Id.* at 832. We granted the owners' application for further appellate review.

We, like the Appeals Court, conclude that there was no breach of the lease by the tenant, albeit on different grounds. We do not take issue with the judge's decision to allow the jury to consider whether the ATM kiosk was a "structure," which the jury did inferentially when they found that the owners had not unreasonably withheld their consent to erect the ATM kiosk. Contrary to the judge's ruling however, we conclude that, taking into account the terms of the lease, the owners failed to advance any legally cognizable reason to withhold their consent for the erection of the ATM kiosk. See *Worcester-Tatnuck Sq. CVS, Inc.* v. *Kaplan*, 33 Mass. App. Ct. 499, 503-504 (1992). Absent any evidence that the owners acted for a valid reason, there was no issue of consent to be decided by the jury. The defendants were entitled, as a matter of law, to a favorable resolution on the issue of consent. We therefore reverse the judgment terminating the lease (Count I). On the claims for

breach of the lease (Count II) and for relief under G. L. c. 93A, § 11 (Count III), we affirm the judgment in favor of the defendants for essentially the same reasons as the Appeals Court.

1. *Facts.* We summarize the evidence at trial.

a. *The 1974 lease.* The property governed by the 1974 lease is located on Route 9 in Natick, at an intersection that makes the property easily accessible to both eastbound and westbound traffic on that thoroughfare. The initial term of the lease, which the original owner executed with the advice of counsel, was for twenty years, with an option for the tenant to exercise four consecutive automatic extensions of ten years each.[5] The lease provided for an annual base rent of $7,200, payable in monthly instalments of $600, that was to increase every five years by a flat rate of ten per cent. Thirty years later, in June, 2004, when judgment was entered in this case, the annual rent had risen to $12,756, or $1,063 per month.[6]

Section 8 of the 1974 lease permitted the tenant to remove any then existing structures on the property and to erect a new building on the property at his expense, referred to in Section 8 as the "Original Construction." Section 8 of the lease also prohibits the erection of any "future buildings or structures" on the property without the written consent of the owner, "which approval shall not be unreasonably withheld."[7] In 1976, presum-

---

[5]In 1994, the tenant exercised his right to the first automatic ten-year extension of the lease.

[6]As noted earlier, there was evidence that the present owners view the terms of the lease as disadvantageous to them. At trial one of the owners described the lease as a "horrible, one-sided lease," and that a "wrong" had occurred because of the "terms of the lease, the length of the lease, [and] the fact that [the owners] had no control over the property." She noted, "My mother thought she signed a twenty-year lease. I have a twenty-two year old daughter, who is my mother's youngest grandchild. She will be fifty-nine when this lease is up."

[7]Section 8 provides as follows: "Lessee presently intends to proceed with architectural plans for the erection of a commercial structure and site improvements, and thereafter to make applications to such governmental agencies as have jurisdiction in the premises for the issuance of such approvals, consents, permits and the like as may be necessary to erect and construct the proposed structure and improvements on the demised premises, including, but not limited to, an application to the Town of Natick Board of Appeals. Lessor

ably having obtained the requisite approvals from the town of Natick, the tenant constructed a one-story building on the property. From 1976 until the execution of the sublease with the bank in 1997, the building housed a retail camera store operated first by the tenant's father, and then by the tenant himself.

b. *The 1997 sublease.* Section 13 of the 1974 lease grants to the tenant the "absolute and unrestricted right at any time and from time to time" to sell or assign the lease or to sublet the property "without the necessity of obtaining *any* approval or consent" of the owner[8] (emphasis added). In the spring of 1997, the tenant engaged in negotiations with the bank to assign all of the tenant's interest in the lease to the bank for the remainder of the term and any extensions thereof. Under the terms of the proposed sublease, the bank would pay the tenant an annual base rent of $27,000, with a ten per cent increase every five years. Over the course of the proposed thirty-eight year sublease, Katz stood to gain approximately $500,000 more than the amount of rent he was required to pay the owners.[9]

The bank proposed to renovate the by-then dilapidated camera store building, and to make other alterations to the property,

---

agrees to join in such applications as may require the consent of the owner of the fee, and hereby authorizes Lessee as her irrevocable attorney-in-fact to execute such applications upon her behalf, all at the expense of Lessee. The aforesaid 'commercial structure' is hereby defined to be and shall be limited to that structure for the construction of which the Town of Natick Board of Appeals shall have first issued a variance, and is hereinafter referred to as 'Original Construction.' Subsequent to such variance first to be granted by the Town of Natick Board of Appeals *no future buildings or structures shall be erected upon the demised premises during the entire term hereof. or any subsequent renewal term unless approved in writing by the Lessor, which approval shall not be unreasonably withheld*" (emphasis supplied).

[8]Section 13 of the lease provides, in relevant part: "The Lessee shall have the absolute and unrestricted right at any time and from time to time to sell, assign or transfer this lease and to sublet all or any part of the demised premises and any and all buildings and improvements erected thereon, in whole or in part, without the necessity of obtaining any approval or consent of the Lessor; but the Lessee shall, nevertheless, in all instances, continue and remain liable to the Lessor on all his covenants in this lease contained."

[9]Under the terms of the sublease, the sublessee would pay the rent owed under the 1974 lease to the owners, and would pay to Katz the difference between that sum and the rent owed under the 1997 sublease.

such as landscaping and reconfiguring the parking lot.[10] As part of its over-all plan for the property, the bank also intended to install a free-standing ATM kiosk in the reconfigured parking lot. The 1974 lease did not require the tenant to obtain the approval or consent of the owners for any changes or alterations to the "original construction" that housed the camera store, to the configuration of the parking lot, or to the landscaping. See note 7, *supra.* Whether the tenant (and inferentially the bank) needed the prior approval of the owner for the erection of the ATM kiosk lies at the heart of this appeal.

In June, 1997, in contemplation of entering into a sublease with the tenant, and without informing the owners, the bank sought various permissions from the town's building inspector, planning board, and zoning board of appeals to proceed with the renovations and to erect a free-standing ATM kiosk with a canopy.[11] A variance to install the ATM kiosk was required because the shape of the property made it impossible for the bank to install the ATM kiosk without violating the minimum setback requirements. The variance was granted by the town's zoning board of appeals on September 22, 1997, with public notice of the decision given on October 17, 1997. Approval of two special permits (one allowing the zoning change from retail use to bank use, and one certifying the bank's compliance with the aquifer protection district) was granted by the town's planning board on October 9, 1997.

c. *The refusal to consent to the ATM kiosk.* On October, 17, 1997, the tenant sent a letter to the owners requesting that they execute a lease estoppel agreement, the terms of which provided (in part) that the owners agreed that the 1974 lease did not

---

[10]In a letter to the director of community development for the town, the bank represented that it would not increase the footprint of the existing building, but would "construct a new facade on the building and do extensive renovations on the inside." There was evidence that the bank ultimately expended between $350,000 and $450,000 in renovations to the building and grounds, and otherwise improved the property.

[11]The ATM kiosk is approximately nine feet tall and nine feet wide, and is bolted by heavy-duty aluminum columns to a cement pad using cement screws. When the canopy covering the kiosk is included in the over-all dimensions, the object measures ten feet high, more than eleven feet wide, and nearly seven feet deep.

prohibit the proposed change of use to a banking facility or the erection of the ATM kiosk.[12,13] The October 17 letter from the tenant's counsel to the owners, following shortly after a conversation between the tenant and one of the three owners, was apparently the first the owners learned of the proposed sublease. The bank, the tenant, and the owners exchanged communications by letter and telephone over the course of the following two weeks. On October 24, 1997, the tenant affirmatively sought the owners' consent for a "structure," namely the ATM kiosk, "in accordance with Article 8 of the ground lease."[14] The owners ultimately refused to execute the lease estoppel certificate or to consent to the erection of the ATM kiosk. Notwithstanding, on October 31, 1997, Katz and the bank entered into a sublease, and in November, 1997, the bank commenced renovations of the camera store building and reconfiguration of the parking lot. See note 10, *supra.*

In January, 1998, the owners sent Katz a notice, declaring him in default of the 1974 lease for, among other things, failing to obtain the owners' written consent to erect a "new structure" on the property before seeking town approval for the structure.[15]

---

[12]The letter stated, in relevant part: "The Camera Company has just entered into a Sublease with MetroWest Bank for the operation of a banking facility, with ATM drive-through availability, and the Bank has requested that you as fee owners of the property kindly execute, after appropriate verification, the Lease Estoppel Certificate and Consent several copies of which are enclosed."

The enclosed lease estoppel certificate stated, in relevant part: "Ground Landlord, Ground Tenant/Sublandlord and Subtenant acknowledge and agree as follows: (a) The use of the Premises by Subtenant for banking purposes, and any uses directly related thereto and customarily found in banks in eastern Massachusetts, specifically including the use of an ATM drive-through facility, is permitted under the Ground Lease."

[13]At trial, the attorney for the bank testified that in his view consent from the owners for the erection of an ATM kiosk was not required by the lease, but that it was "good practice" to request an estoppel certificate.

[14]The tenant's letter to the owners, dated October 24, 1997, stated, in relevant part: "The structure for which we would be seeking [the owners'] approval, in accordance with Article 8 of the ground lease, is the ATM facility . . . ."

[15]Paragraph 3 of the January, 1998, notice of default charges that the tenant "attempted to obtain variances and change of use permits from the Town of Natick without notice to the landlord and without the landlord's consent or approval." Paragraph 4 of the notice of default charges that the tenant had "failed to obtain the landlord's written approval to construct a new structure

Katz responded that the lease was not in default, specifically denying that the lease required the owners' permission to seek various approvals from the town, and stating that he had in fact sought permission from the owners for the construction of the ATM kiosk, to which no response had been received. The record is devoid of any further communications between the owners and the tenant before litigation commenced.

The owners filed this action in March, 1998.[16] In addition to breach of lease claims, the owners alleged that the tenant and the bank had violated G. L. c. 93A, § 11, by failing to inform the owners of the applications for variances and permits submitted to the town, and alleging that the defendants had improperly held themselves out as "agents" of the owners before the town without the owners' consent. See discussion, *infra*.

2. *Breach of the lease.* Because it is potentially dispositive of the breach of lease claims, we consider first the defendants' argument that the ATM kiosk is not a "structure" under the terms of the lease, but is instead a "trade fixture" (as referenced in Section 9 of the lease[17]), the erection of which did not require the consent of the owners. We conclude that the judge properly permitted the tenant to argue the issue to the jury.

By statute, "in determining what are fixtures, the common law rules prevailing between a landlord and a tenant for years shall govern." G. L. c. 184, § 12. In Massachusetts, the ques-

---

on the property prior to [the] attempt to obtain permits for such structure and prior to the commencement of construction of such structure."

[16]The owners alleged that the bank had begun construction of the ATM kiosk in November, 1997. The undisputed evidence was to the effect that the renovations of the existing camera store began around that time, but that the ATM kiosk was not erected until 1998, after the complaint was filed.

[17]Section 9 of the lease provides, in relevant part: "*All buildings, structures, additions, alterations and improvements made by Lessee upon the demised premises shall become and remain the property of Lessor and shall not be removed at the termination of this lease,* but shall be delivered up at the end of the term in good repair and condition, reasonable use and wear, and damage by fire or other inevitable accidents only excepted, and free from any and all encumbrances. *All trade fixtures installed by Lessee or his assigns or subtenants* and used in connection with the business conducted by him or them on said demised premises shall remain their property, as the case may be, and *may be removed by Lessee from time to time and at the termination of this lease.* Any damage, however, caused by such removal shall be repaired by Lessee." (Emphases added.)

tion whether an object is a fixture is typically one for the finder of fact. See, e.g., *Stone* v. *Livingston*, 222 Mass. 192, 194-196 (1915) (when object could not be deemed so affixed to property as to be real property, or in alternative deemed to be "furniture," question whether it is realty or chattels is one of fact that is "properly submitted to the jury"). See also *Southern Mass. Broadcasters, Inc.* v. *Duchaine*, 26 Mass. App. Ct. 497, 499 (1988) (distinction between fixture that tenant had right to remove and fixture that tenant had no right to remove was question of fact properly placed before jury); E.G. Daher & H. Chopp, Landlord and Tenant Law § 13.42 at 137 (3d ed. 2000) (question whether items are unannexed has generally been held to be one of fact). In this case the jury could have concluded that the ATM kiosk was a trade fixture, even considering that the ATM kiosk was affixed to concrete pads and covered by a canopy. But that finding was not compelled, especially in light of evidence that, before litigation, the tenant had himself considered the ATM kiosk a "structure," the erection of which required the owners' consent. See note 14, *supra*.[18]

The judge declined to grant Katz's request for a jury instruction defining the term "trade fixture," and Katz's attorney did not object to the ruling. However, he did request permission to argue to the jury that the ATM kiosk was not a "structure" for the purposes of the lease. The judge granted the request and the point was duly argued.[19] Special questions were put to the jury, but neither defendant requested that the jury be asked to find that the ATM kiosk was a structure, not a trade fixture. Yet the jury did find, inferentially at least, that the ATM kiosk was a structure, because such a conclusion was a necessary condition

---

[18]The defendants point to several cases that explicate the term "trade fixture." We do not reject their point that the jury *could* have found that the ATM kiosk fell within those descriptions. See, e.g., *Worcester Redevelopment Auth.* v. *Department of Hous. & Community Dev.*, 47 Mass. App. Ct. 525 (1999) (oil storage tanks determined to be removable property); *Consiglio* v. *Carey*, 12 Mass. App. Ct. 135 (1981) (walk-in freezer determined to be removable fixture). But those cases do not compel a conclusion that the ATM kiosk in this case was a trade fixture as a matter of law.

[19]In his closing argument, counsel for Katz stated that "this [ATM kiosk] was a trade fixture not a structure, so . . . there could not possibly have been a material breach of the lease by failing to get consent, because it wasn't even a structure anyway, as that term is used in the lease. It was a trade fixture."

precedent to finding, as they did, that the owners did not unreasonably withhold consent to install the ATM kiosk. We see no justification for setting aside the judgment on the ground that the ATM kiosk was not a "structure."[20]

3. *Reasonable consent to erect a structure.* The tenant argues that even if the consent of the owners was required for the erection of the ATM kiosk, that consent was unreasonably withheld. The issue was put to the jury,[21] who found that the owners did not unreasonably withhold their consent. Having reviewed the record, we conclude that there were no facts to be resolved by a jury[22] because the evidence permitted no finding in favor of the owners as a matter of law. The judge should have allowed the tenant's motion for judgment notwithstanding the verdict on

[20] The Appeals Court reasoned that, "although a broad definition of structure might include many items also considered trade fixtures, the [1974] lease specifically distinguishes between the two, meaning that a trade fixture cannot also be a structure under this lease." *Chapman* v. *Katz*, 65 Mass. App. Ct. 826, 831 n.8 (2006). It is far from clear that Section 9 of the lease must be interpreted in such a divisive manner. Section 9 distinguishes between "trade fixtures" and "structures" for the purpose of classifying which objects may be removed from the property at the end of the lease, and those that must remain. In contrast, Section 8 addresses which objects may be erected on the property; Section 8 is silent as to trade fixtures, and does not exempt trade fixtures from the requirement that permission be obtained by the tenant.

The Appeals Court relied on *Clark* v. *State St. Trust Co.*, 270 Mass. 140, 151 (1930), in concluding that "words used in one undoubted sense in one place [in a contract] may be presumed to be used in the same meaning in another place in the writing." In that case, this court further noted that "[t]his so called presumption is an aid and not an end. It is generally to be followed but it is not inflexible. It yields to the main purpose, which is to find out what the writing means as a whole." The latter construct more closely addresses what the parties appear to have intended in this lease. The terms "structure" and "trade fixture" have not historically been mutually exclusive. See, e.g., *Smith* v. *Whitney*, 147 Mass. 479, 481 (1888) ("engine-house was not an addition to the lumber-house, but a building which the defendant had a right, under the lease, to remove"); *Whitwell* v. *Harris*, 106 Mass. 532, 536-537 (1871). It does no violence to the language of this lease to suggest that the terms "structure" and "trade fixture" were not mutually exclusive for all purposes.

[21] The first special question to the jury asked: "Did the plaintiffs unreasonably withhold consent for the ATM kiosk?"

[22] There was evidence as to all of the reasons advanced by the owners for withholding consent to erect the ATM kiosk. The tenant did not challenge any of the proffered reasons on factual grounds, but argued only that none of the reasons was reasonable.

those grounds. See *J. Edmund & Co.* v. *Rosen*, 412 Mass. 572, 575 (1992), and cases and authorities cited (party with burden of proof may, though rarely, prevail as matter of law where facts not disputed, and disagreement concerns only controlling legal principles).

We dispose of the preliminary point first. The owners argue that their consent was required not only for the ATM, but before any applications for any of the variances or permits were filed with the town. The defendants responded that consent was required for the erection of the ATM kiosk only. We agree with the defendants. The 1974 lease permitted the tenant the absolute right to sublease the property during the entire term of the lease. See note 8, *supra.* The owners retained neither the right to approve the business of any subtenant, nor the right to object to a change in the use of the property from a retail store to a bank. Neither did the owners retain the right to object to changes in the landscaping, reconfiguration of the parking lot, or installation of curb cuts to improve street access to the property.[23] Consent of the owners to any change effecting the property was limited to the erection of "future buildings or structures." See note 7, *supra.* We agree with the judge that the lease did not require the owners' consent before approval for the planned renovations were sought, because, as she observed, "no rational finder of fact in my estimation could construe the words [of the lease] 'erect a structure' as including a permitting process."[24] For this sublease, the only "future buildings or structures" involved in the bank's use of the property was the installation of the ATM kiosk.

Turning to the issue of consent, the defendants contend that the refusal of the owners to consent to the erection of the ATM

---

[23]Permission to change the use of the property and make additional curb cuts was sought and obtained from various authorities of the town.

[24]The owners argued that the authority to apply for building permits was limited to the specific structure referred to in the lease as the "Original Construction" (completed in 1976), and that the defendants breached the lease by seeking subsequent permits from the town without the owners' written approval. Because Section 8 of the 1974 lease requires consent only for the erection of "buildings or structures" on the premises, erection, they posit, should be deemed to encompass permit seeking from the town. The judge correctly declined to permit the owners' counsel to argue this theory to the jury. Counsel did not object to her ruling.

kiosk was not reasonable, as required by Section 8 of the 1974 lease. See note 7, *supra*.[25] Contrary to the owners' argument, the tenant and bank did request the consent of the owners. The tenant first raised the issue in a letter dated October 17, 1997, requesting that the owners execute a lease estoppel certificate to the effect that the use of the property as a bank, including the use of an ATM drive-through facility, was permitted under the 1974 lease. See note 12, *supra*. The owners refused to execute the estoppel certificate. The tenant then expressly requested consent from the owners for the erection of the ATM kiosk. See note 14, *supra*. The owners did not respond to the tenant, but informed the bank that "approval pursuant to paragraph 8 of the original lease" could not be granted until the owners' concerns of liability insurance sufficient to cover risks they asserted were associated with the operations of a bank, and conversion of the premises back to a general commercial facility in the event that a bank ceased to operate on the site, were addressed. The bank promptly responded that, while the lease did not require it to do so, it would agree to satisfy the specific concerns expressed by the owners. It forwarded to the owners a revised lease estoppel certificate and consent incorporating the terms requested by the owners.[26] Notwithstanding, on November 11, 1997, the owners refused to give their consent. The bank

---

[25]The tenant and the bank both sought a directed verdict on the issue, asserting that "the evidence is insufficient to establish a breach of contract or breach of lease because . . . the evidence is insufficient to permit a finding that the plaintiffs' withholding of consent to place an ATM machine on the leased property was reasonable, as required by the plaintiffs' covenant in the lease." Both motions were properly denied. "If the defense moves for a directed verdict, and the trial judge thinks resolution of the matter is on the tipping point, it is sound practice to deny the motion and to give the case to the jury, which may render the question academic by returning a verdict for the defendant. If the jury finds for the plaintiff, the trial judge may, upon a motion for judgment [notwithstanding the verdict] reconsider and decide the issue previously presented by the motion for a directed verdict." *Phelan* v. *May Dep't Stores Co.*, 60 Mass. App. Ct. 843, 844 n.2, *S.C.*, 443 Mass. 52 (2004), citing *Smith* v. *Ariens Co.*, 375 Mass. 620, 627-628 (1978). The tenant renewed the claim in his motion for judgment notwithstanding the verdict. The judge denied that motion without discussing the reasonableness of the owners' refusal to consent to the erection of the ATM kiosk, noting only that the jury had found that consent was not unreasonably withheld.

[26]Paragraph 8 (a) of the proposed revised lease estoppel certificate stated, in relevant part: "Upon expiration of the Term, Subtenant agrees that it will

eventually erected the ATM kiosk on the property in the spring of 1998.

In their brief, the owners posit their "legitimate concerns" about "the future ability to rent the property, insurance, and additional zoning limitations" as their reasons for refusing their consent. These mirror their objections raised with the bank before litigation. At trial they also raised, for the first time, a plethora of other objections. We examine each in turn, and conclude that none is availing.

The standard for determining a "reasonable" refusal to give consent in a commercial lease is summarized in *Worcester-Tatnuck Sq. CVS, Inc.* v. *Kaplan*, 33 Mass. App. Ct. 499, 503-504 (1992) (*Worcester-Tatnuck*), quoting *1010 Potomac Assocs.* v. *Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 209-210 (D.C. 1984):

> "In a commercial context, only factors which relate to a landlord's interest in preserving the property or in having the terms of the prime lease performed should be considered. Among the factors properly considered are the financial responsibility of the subtenant, the legality and suitability of the proposed use, and the nature of the occupancy. A landlord's personal taste and convenience, on the other hand, are not factors properly considered. . . . '[I]t is unreasonable for a landlord to withhold consent to a sublease solely to extract an economic concession or to improve its economic position.' "

See Restatement (Second) of Property (Landlord & Tenant) § 15.2 (2) (1977) ("the landlord's consent to an alienation by the tenant cannot be withheld unreasonably, unless a freely

---

remove the ATM and other aspects of the construction which are specific to banking such that the Premises can be used for general office uses."

Paragraph 8 (c) of the proposed revised lease estoppel certificate stated, in full: "Subtenant agrees to carry throughout the Term comprehensive general liability insurance for the Premises in the amount of $____, naming the Overlandlord as additional insured. Subtenant also will maintain interior and exterior security cameras and such other devices and personnel as are customary for banks in the Metrowest area for adequate security." The bank in fact carried $10 million in excess liability insurance on the property — twice the amount requested by owners in their October 29 letter — and the owners were named as additional insureds on the policy.

negotiated provision in the lease gives the landlord an absolute right to withhold consent'').

The overarching objection of the owners was to the conversion of the property from retail use to bank use, and they were dismayed that the tenant was authorizing the development of the property without their knowledge or consent.[27] But the 1974 lease expressly permitted the tenant to sublease the property, and the original owner retained no right to approve any sublease or to condition her approval on any particular use of the property. The owners proffered no evidence of any diminution in value of the property occasioned by the change of use of the property to that of a banking facility. Their preference for maintaining a retail store on the property is a matter of "personal taste," and not a reasonable basis for refusing consent. *Worcester-Tatnuck, supra* at 504.

The owners questioned the adequacy of the liability insurance on the property in light of its changed use to a banking facility. Consent could not be refused for that reason. The terms of the 1974 lease required the tenant to hold the owners harmless from any and all damages or claims of injury.[28] In any event, it is undisputed that the bank agreed to (and did) provide additional liability insurance in favor of the owners in an amount substantially greater than they requested, agreed to install additional security devices as requested by the owner, and agreed to remove the ATM kiosk and return the premises to a general office facility at the end of the sublease.

---

[27]Prior to trial, in response to the tenant's request for consent, the owners claimed that as a commercial landlord they could be "liable for any injuries/damages occurring on its property," and because the ATM machine would be available beyond "normal business hours," they sought additional liability insurance from the bank, naming the owners as insured "in the event an injury or death occurs at said property" in the amount of $5 million. See note 25, *supra*. At trial, one of the owners testified that she "was fearful" because of "robberies . . . people driving in twenty-four hours a day, [who] could potentially be held up."

[28]Section 10 of the 1974 lease provides that the tenant "covenants to save Lessor harmless from all loss, costs, damages and expenses of any kind whatsoever arising out of any accident, damage or injury, or any claim, suit or action for damages or injuries from any cause whatsoever, either to persons or property happening, occurring or resulting in or upon the leased premises or improvements thereon during the term or any renewal term herein demised . . . ."

The owners raised concerns about purported zoning limitations that would be imposed on the property when its use changed from retail to banking. A zoning change was required from the planning board for conversion of the property from retail to bank use, and would be required if the property were again to be used for retail purposes. But there was no evidence presented, as the owners admitted at trial, that a future application for a change in use from commercial use to banking use would not be forthcoming.[29]

The owners claimed, again only after litigation commenced, that the irrigation system to be installed by the bank would be expensive to maintain at the end of the lease. The owners failed to explain why they would be *required* to maintain the system some thirty-eight years after its installation on the expiration of the sublease.[30] One owner also testified that it was not the sprinkler system as such that concerned them, but the failure of the defendants to ask for permission to install it. Failure to consent on these grounds was unreasonable as a matter of law: installation of an irrigation system was not prohibited by the lease, and could have been installed by the tenant without the owners' consent.

At trial the owners raised for the first time concerns about the potential increase in traffic accidents and related liability because of the presence of an ATM on the property. As noted above, the tenant is required to indemnify the owners for any loses they may suffer, and the bank provided substantial liability coverage in favor of the owners. Moreover, the director of community development testified that the planning board does not issue a site plan "special permit," such as the one at issue here, until the planning board is satisfied that any possible traffic issues have been addressed adequately. The lease, of

---

[29]This concern was raised for the first time at trial. Before litigation commenced, the owners asked only that the bank assume responsibility for "converting this building back into the same general commercial facility that it is now and to pay all construction costs to do so." The bank agreed to do so.

[30]One of two special permits the bank obtained from the town's planning board required compliance with the regulations of the "aquifer protection district" (APD). An APD permit was granted, but the conditions imposed, if any, are not in the record.

course, does not permit the owners to withhold their consent on the ground of purported traffic concerns.

Finally, at trial the owners testified that they refused to give their consent as requested because the defendants did not seek their consent before obtaining the various permissions from the town to convert the premises to a banking facility.[31] The lease requires no such consent. As the tenant notes, the town could have denied the bank's applications, in which event the proposed sublease would have been a nullity. In the words of the tenant, it may or may not have been "appropriate" to solicit the owners' consent before the zoning dimensional variances required for the placement of the ATM kiosk on the property was sought, but there was no requirement that either the tenant or the bank do so.[32]

In summary, none of the reasons proffered by the owners for withholding their consent to the erection of the ATM kiosk provides a legally cognizable basis to withhold consent. Accordingly, withholding consent could only have been unreasonable. We agree with the tenant that the withholding of consent appears to have been an effort by the owners to alter the terms of the 1974 lease. Stated differently, the owners appear to be engaged in an effort "to extract an economic concession or to improve [their] economic position," which the law does not sanction. *Worcester-Tatnuck, supra* at 504. In light of the bank's agreement to address and satisfy each concern raised by the owners before litigation commenced, the failure to consent to the erection of the ATM kiosk was unreasonable as a matter of law.[33]

The duration and terms of the lease have given rise to

---

[31]One of the owners testified that, in her view, the tenant had improperly given the bank permission to go before the town to obtain the various permits necessary to convert the property to the banking use. She also testified that she objected because the tenant could demolish the building on the property without the owner's permission.

[32]The owners complain that they were improperly rushed to make a decision once the town permits necessary to convert the property to a banking facility had been obtained. The evidence is undisputed that the erection of the ATM kiosk on the property did not occur until the spring of 1998, months after the tenant first requested the owners' consent.

[33]The owners' reliance on *Healthco, Inc.* v. *E & S Realty Assocs.*, 400 Mass. 700 (1987), is misplaced. In that case, the tenants had expressly agreed

understandable concerns on the part of the present owners who, by the terms of the lease, are all but excluded from any role in the development of their property for some sixty years. But the lease was negotiated with the advice of counsel, on terms that may at the time have been favorable to the mother. It is not for a court to amend those terms.

4. *Claims for damages and attorney's fees.* For essentially the same reasons as the Appeals Court, we affirm the judgment denying the owners' claims for breach of contract damages and for damages and attorney's fees under G. L. c. 93A, § 11.

On the breach of contract claim for damages, the owners are entitled to no recovery. The owners unreasonably withheld their consent to the erection of the ATM kiosk, and its erection therefore cannot constitute grounds for either breach of contract or ensuing damages. See Restatement (Second) of Property (Landlord & Tenant) § 15.2, comment g at 104 (1977) ("If the landlord . . . withholds unreasonably his consent . . . the [tenant] may proceed . . . without regard to the terms of the restraint on alienation, because the restraint is valid only to the extent the consent . . . is not withheld unreasonably").

In the alternative, the owners claim that the jury "could" have found that the defendants materially breached the lease by seeking zoning and other permissions from the town without their consent.[34] The defendants contend that the argument is made for the first time on appeal, and is therefore waived, citing *Carey* v. *New England Organ Bank*, 446 Mass. 270, 285 (2006), and *McNamara* v. *Honeyman*, 406 Mass. 43, 53 (1989). We need not resolve that issue because even if not waived, the claim has no merit. The defendants did not breach the lease by the act of seeking permits from the town. See *supra.*

The owners also contend that as they "continue to think about this case, it comes to mind that there is a second way the jury could have viewed the evidence": that the defendants

to request the landlord's consent before assigning their lease to a third party, but failed to do so. *Id.* at 701, 702.

[34]The owners note that the bank executed an agreement with the town in December, 1997, in which the bank agreed to defend, indemnify, and hold harmless the town from and against all claims arising out of the issuance of the permits, including claims that the bank had no authority to obtain such permits.

breached the lease by representing themselves to the town as agents of the owners. This argument is waived; it was not argued on appeal. Moreover, the evidence does not support a finding of breach. While there is evidence that an attorney for the bank signed as the "agent" for the "owner" on the building inspector's application forms for the variance and interior demolition permit, there was no evidence that the tenant did so.[35] There is also evidence that on several occasions during the various permit application processes, the bank's attorney corresponded with town officials in writing, explaining that he was representing a potential subtenant and that he did not represent the owners. The misrepresentation alleged here did not constitute independent grounds for finding a breach of the lease.[36]

Finally, we consider the owners' remaining claim that in light of the jury findings that both defendants committed an unfair act or practice, they are "at a minimum" entitled to reasonable attorney's fees under G. L. c. 93A, § 11. As noted by the Appeals Court, in order for the owners to recover attorney's fees under G. L. c. 93A, § 11, the unfair or deceptive conduct "must have had some adverse effect on the [owners], even if it is not quantifiable in dollars." *Chapman* v. *Katz*, 65 Mass. App. Ct. 826, 832 (2006), quoting *Jet Line Servs., Inc.* v. *American Employers Ins. Co.*, 404 Mass. 706, 718 (1989). The jury found that the owners had suffered no injury or loss from the acts of Katz or the bank. No relief is available under G. L. c. 93A, § 11. See *Hershenow* v. *Enterprise Rent-A-Car Co. of Boston*,

---

[35]Two of the owners testified that they *presumed* that the tenant had given the bank permission to seek the permits, but they provided no evidence to that effect. The tenant testified that while he knew the bank was seeking permits, he did not sanction or approve the applications. In completing the building permit application, the attorney for the bank did list the name and address of the attorney for the tenant as the contact of record for the owners. However, there is no evidence that either the tenant or his attorney engaged in any permit-seeking activities, or misrepresented to anyone that the tenant was the owner of the property.

[36]Because the tenant did not breach the lease, we need not consider whether disgorgement of rents paid by the bank to the tenant should be paid to the owners, nor need we reach the question whether the default notice issued by the owners was sufficient under the terms of the lease. Similarly, we have no need to consider whether the owners are obligated to reimburse the bank for the improvements made to the property as ordered by the judge.

445 Mass. 790, 797-802 (2006); *Lord* v. *Commercial Union Ins. Co.*, 60 Mass. App. Ct. 309, 322 (2004).[37]

5. *Conclusion.* Insofar as the judgment terminates the lease and requires the owners to reimburse the bank for the cost of improvements to their property, it is vacated, and a new judgment shall enter as to Count I declaring that there was no breach of the lease. The lease remains in full force and effect. As to Counts II and III, the judgment is affirmed. The case is remanded to the Superior Court for such other and further relief as may be required consistent with this opinion.

*So ordered.*

---

[37]The owners argue that the judge's entry of a declaratory judgment terminating the lease constitutes equitable relief that can form the basis of a damages claim under G. L. c. 93A in the absence of money damages. Because we vacate her order declaring the lease terminated, we need not reach this claim.