MICHAEL D. BANK & others,[1] trustees,[2] *vs.* THERMO
ELEMENTAL INC., & others.[3]

Middlesex. February 7, 2008. - June 16, 2008.

Present: GREANEY, IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Hazardous Materials. Massachusetts Oil and Hazardous Material Release
Prevention Act. Comprehensive Environmental Response Compensation
and Liability Act. Real Property,* Environmental damage. *Contract,* Indem-
nity, Construction of contract. *Practice, Civil,* Judgment notwithstanding
verdict, Costs, Attorney's fees, Interest. *Statute,* Construction. *Evidence,*
Relevancy and materiality. *Jurisdiction,* Superior Court.

In a civil action involving the interpretation of a lease agreement, the judge
    erred in ruling as a matter of law that the agreement unambiguously restricted
    an indemnification provision to the activities of a particular tenant alone,
    where the meaning of that provision, and the scope of the indemnity being
    provided in particular, presented a question of fact to be decided by the
    jury. [648-651]
A Superior Court judge erred in allowing a motion for judgment notwithstand-
    ing the verdict brought by a defendant on the plaintiffs' contract-based
    claim, where the evidence allowed the jury to draw a reasonable inference
    in favor of the plaintiffs. [651-652]
In a civil action brought pursuant to G. L. c. 21E by trustees of a certain real
    estate trust seeking to recover reasonable costs necessitated by its appropri-
    ate response to the release of hazardous material by the defendants, corporate
    lessees of trust property, judgment properly entered against the defendants,
    where the private right of action created in § 4 of that statute did not
    establish strict compliance with the Massachusetts Contingency Plan as a
    condition precedent to recovery of any response costs [652-658]; further,
    there was no error in the judge's instruction to the jury on this issue
    [658-659].
In a civil action brought pursuant to G. L. c. 21E by trustees of a certain real
    estate trust seeking to recover reasonable costs necessitated by its appropri-
    ate response to the release of hazardous material by the defendants, corporate
    lessees of trust property, attorney's fees were properly included in the
    award of response costs, where there was nothing in the statute to exclude
    otherwise legitimate response costs simply because they related to services
    provided by an attorney; moreover, the judge properly instructed the jury

[1]Robert J.M. O'Hare, Jr., and Thomas M. Dusel.
[2]Of the Lincoln Street Trust.
[3]Thermo Electron Corporation, Fisher Scientific Company, Instrumentation
Laboratory Company, Allied Corporation, and Allied-Signal Corporation.

that only reasonable, necessary, and appropriate response costs, not litigation costs, could be included in the award under § 4 of the statute, and there was sufficient evidence in the record to support the jury's conclusions regarding the attorney's fees assessed, notwithstanding the defendants' objections to specific items represented on the trust's law firm's billing records. [659-661]

The judge in a civil action properly calculated an award of prejudgment interest, where the approximation he employed fairly reflected the legislative purpose of G. L. c. 231, §§ 6B and 6C. [662-663]

The judge in a civil action properly determined that none of the defendants was entitled to an award of costs and attorney's fees under G. L. c. 21E, § 4A(*f*), where such request was not made in a pleading. [663-667]

In a civil action pursuant to G. L. c. 21E by trustees of a certain real estate trust seeking to recover reasonable costs necessitated by its appropriate response to the release of hazardous material by the defendants, corporate lessees of trust property, the judge properly awarded the trust litigation fees and costs under § 15 of that statute, where the jury found that the trust did not cause or contribute to the contamination of the groundwater under its property. [667-669]

Minor inaccuracies, omissions, and errors in the contents of a letter issued pursuant to § 4A of the Massachusetts Oil and Hazardous Material Release Prevention Act, G. L. c. 21E, did not bar jurisdiction over a claim under that statute, when all other procedural requirements of § 4A were complied with. [669-670]

In a civil action pursuant to the Massachusetts Oil and Hazardous Material Release Prevention Act, G. L. c. 21E, it was well within the judge's discretion to admit in evidence an environmental report commissioned by the plaintiff trust, where the report was relevant to the trust's compliance with the Massachusetts Contingency Plan, as well as to establish the amount of the response costs sought by the trustees, and was admitted with an appropriate limiting instruction. [670-671]

CIVIL ACTION commenced in the Superior Court Department on June 18, 1996.

Motions for summary judgment were heard by *Regina L. Quinlan,* J., and *Diane M. Kottmyer,* J., and the case was tried in two parts before *Thomas P. Billings,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*C. Dylan Sanders & Lisa C. Goodheart* for the plaintiffs.

*Jonathan Sablone (Marcus E. Cohn & J. Christopher Allen, Jr.,* with him) for the defendants.

The following submitted briefs for amici curiae:

*Martha Coakley,* Attorney General, *& Seth Schofield,* Assistant Attorney General, for the Commonwealth.

*Stephen D. Anderson, Arthur P. Kreiger, & Douglas H. Wilkins* for Real Estate Bar Association for Massachusetts & another.

*Michelle N. O'Brien* for LSP Association, Inc.

BOTSFORD, J. After trichloroethylene (TCE)[4] was found in the groundwater beneath their property in Waltham, the plaintiff trustees of the Lincoln Street Trust (trustees; trust; the words are used interchangeably) undertook a response action pursuant to the Massachusetts Oil and Hazardous Material Release Prevention Act, G. L. c. 21E, eventually spending more than $800,000 in the effort. At issue in this case is the trustees' endeavor to recover the costs incurred in carrying out this response from the several entities that successively leased the property between 1963 and 1988, as well as from corporate parents of some of those entities. The trustees commenced this action in the Superior Court to accomplish the cost recovery; their claims under G. L. c. 21E, § 4, as well as a contract-based claim, were tried to a jury, and the trial judge thereafter tried jury-waived the various parties' claims to attorney's fees and costs under G. L. c. 21E, §§ 4A and 15. We conclude that, pursuant to the jury's verdict, the trustees are entitled to recover their response costs under G. L. c. 21E, § 4, and also in connection with their contract claim[5]; and that they are entitled to attorney's fees under c. 21E, § 15. We also conclude that none of the defendants is entitled to recover its litigation-related attorney's fees and costs under c. 21E, § 4A (*f*). We affirm in part and reverse in part the judgment entered in the Superior Court.[6]

1. *Background.* What follows is a brief summary of the factual background of the case and the proceedings in the Superior Court[7]; further details concerning the facts and prior proceedings are discussed in connection with particular issues raised.

---

[4]Trichloroethylene (TCE) is a type of industrial solvent used to clean and degrease metals and glass. The parties do not dispute that TCE qualifies as a "[h]azardous material" as defined in G. L. c. 21E, § 2.

[5]We therefore vacate the trial judge's allowance of the motion for judgment notwithstanding the verdict on the contract claim.

[6]We acknowledge the receipt of amicus briefs filed by the Commonwealth, the LSP Association, Inc., and the Real Estate Bar Association for Massachusetts and the Abstract Club.

[7]The jury trial in this case lasted three weeks, followed by a shorter trial on nonjury claims before the same trial judge. Thereafter, the parties filed extensive posttrial motions. The record reflects the very careful, thorough, and thought-

The trust is the owner of an eleven-acre property on Lincoln Street in Waltham (the site, or the property). The entire beneficial interest of the trust is owned by the Middlesex Mutual Building Trust (MMBT). The trust leased the property seriatim to a number of different entities between 1963 and 1988 under the same lease agreement, which was dated August 2, 1963 (lease). At the outset of the lease term, the trustees built a two-story manufacturing facility on the site in accordance with the specifications of the original tenant, the Jarrell Ash Company (JAC), and during the twenty-five years the lease was in effect, the successive lessees manufactured scientific instruments on the site. The lease included a provision requiring the lessee to indemnify the trust from liabilities arising from the lessee's use of or activities on the property.

a. *Corporate history.* The various entities that operated on the site present a complicated corporate history. The first tenant, JAC, occupied and used the site from the commencement of the lease in August, 1963, to some time in 1968. In that year, JAC sold some of its assets to Fisher Scientific Company, a Pennsylvania corporation (Fisher Pennsylvania). Fisher Pennsylvania assumed the lease pursuant to a written assignment, and took over manufacturing at the site. In 1981, Fisher Pennsylvania was acquired by Allied Corporation (Allied).[8] Allied formed a Delaware subsidiary and merged Fisher Pennsylvania into it, and the subsidiary then changed its name to Fisher Scientific Company (Fisher Delaware). In 1984, Fisher Delaware merged with Instrumentation Laboratory Inc. (IL Inc.). The new combined entity was renamed Allied Health & Scientific Products Company (AHSPC), and it remained a subsidiary of Allied. AHSPC continued to manufacture scientific equipment on the site.

In 1986, AHSPC sold its Jarrell Ash scientific instrumentation manufacturing business to Thermo Jarrell Ash Corporation (TJA),[9] a subsidiary of Thermo Electron Corporation (Thermo Electron) that was created for purposes of completing the sale.

ful work of the judge throughout the trial and posttrial proceedings.

[8]After a 1985 merger between Allied Corporation and the Signal Companies, Allied-Signal, Inc., was formed. We shall refer to both companies as "Allied."

[9]Thermo Jarrell Ash Corporation (TJA), the last lessee under the August 2,

AHSPC then assigned its interest in the 1963 lease to TJA. The asset purchase and closing agreement between AHSPC and TJA included an indemnification provision that allowed TJA to pass on to AHSPC any liability resulting from AHSPC's tenancy on the site. Shortly after the asset sale between AHSPC and TJA took place, AHSPC changed its name to Fisher Scientific Company (Fisher Delaware II), which remained a subsidiary of Allied.

In 1988, TJA signed a lease termination agreement (1988 agreement, or agreement) with the trustees that contained an indemnification provision in favor of the trustees. In the same year, TCE was discovered on the site. In 1991, Fisher Delaware II formed a subsidiary called Instrumentation Laboratory Company (IL Co.), which was sold later that year. Before the sale, Fisher Delaware II (formerly AHSPC) assigned to IL Co. the indemnity obligation that it owed to TJA under the 1986 asset sale agreement between AHSPC and TJA.

b. *Discovery of TCE and ensuing response action.* In 1985, the trust's beneficial owner, MMBT, commissioned an environmental consulting firm, Haley & Aldrich, to conduct a preliminary site investigation at the property. The investigation revealed some broken sewer lines, as well as past discharges of chemicals into the floor drains, but it did not uncover any evidence of a discharge of chemicals into the ground. In 1987, MMBT commissioned Haley & Aldrich to conduct an additional investigation of the site, and the 1988 report of that work concluded that TCE was present in groundwater at the site in concentrations above recommended levels. As the owners of the property and therefore a liable party under G. L. c. 21E, § 5 (*a*) (2), the trustees undertook a response action on the site pursuant to G. L. c. 21E, § 4. The response was not completed until 2000. The twelve-year effort spanned both the promulgation of the Massachusetts Contingency Plan in October, 1988, see 310 Code Mass. Regs.

1963, lease (lease), has no formal corporate relationship with the Jarrell Ash Company (JAC), the first lessee under the lease. Some time after the trial TJA changed its name to Thermo Elemental Inc. The companies involved on the site reused the names "Jarrell Ash," "Fisher," and "Instrumentation Laboratory," apparently because those names were thought to be good brand names. As the judge noted, "The result is a confusing (to the outsider) assemblage of corporate entities, with similar and sometimes identical names."

§ 40.006 (1988), and its revision in 1993, see 310 Code Mass. Regs. § 40.0005 (1995). The trust eventually spent more than $800,000 in consultant fees, drilling, and laboratory costs, including approximately $90,000 for response-related work conducted by the trust's attorneys. At the conclusion of the work, the Department of Environmental Protection (department) approved the trustees' conclusion that the amount of TCE on the site was sufficiently small that it did not need to be contained or removed.

The trustees believed that TJA was liable for the response costs under the indemnity provision in the 1988 agreement. Accordingly, beginning in 1989, Thomas M. Dusel, one of the trustees, kept Earl R. Lewis, then TJA's senior vice-president and later president, informed of the progress of the response action. In a 1989 letter, TJA informed Fisher Delaware II of the contamination found at the site and invoked Fisher Delaware II's obligation to indemnify TJA for any liability TJA had for the cleanup costs. The parties met at least twice to discuss the response costs, once in 1991 and once in 1992. In December, 1995, the trustees sent a letter setting out a formal demand for reimbursement of response costs under G. L. c. 21E, § 4A. The letter was sent to JAC, Fisher Delaware II, Allied,[10] IL Inc., AHSPC, TJA, and Thermo Electron.[11] The recipients responded within the time required by § 4A (*a*),[12] and a meeting was held in April, 1996, to discuss the trustees' demand. The parties did not reach an agreement at the meeting, and no subsequent meeting was ever arranged. The trustees commenced this action in the Superior Court in June, 1996.

c. *Procedural history.* The trustees' original complaint named the eight recipients of the § 4A demand letter as defendants, and in an amended complaint filed in November, 1996, added IL Co. as a ninth defendant. The trustees included in their complaint claims against all defendants under G. L. c. 21E, §§ 4, 4A, 5, and 15, a request for declaratory relief to resolve liability for future response costs, and a breach of contract claim against

[10]The letter was sent to both Allied Corp. and Allied-Signal, Inc.

[11]IL Co. was not itself a recipient of this demand letter, but was aware of its indemnification obligations to several of the recipients.

[12]JAC had long since been dissolved and did not respond to the demand letter.

TJA based on the indemnification provision in the lease termination agreement. In 1998, a judge in the Superior Court denied cross motions for partial summary judgment filed by TJA and the trustees on the breach of contract claim, ruling that the language of the indemnification provision in the lease termination agreement was ambiguous and a trial was required to establish its meaning. In 2000, a different Superior Court judge granted partial summary judgment with respect to some of the trustees' remaining claims under G. L. c. 21E. The judge ruled that all claims under G. L. c. 21E for response costs paid by the trustees before July 1, 1989, as well as the trustees' claims under c. 21E, § 5, were barred by the applicable statutes of limitations.[13]

The case was tried by a third Superior Court judge in two parts in 2002. In September, 2002, the trustees' claims to recover response costs pursuant to § 4 and to recover on the indemnity provision in the 1988 agreement were tried to a jury.[14] The jury found that the trust did not cause or contribute to the release of TCE at the site, that Fisher Delaware II should bear a one hundred per cent equitable share of the response costs — which were determined to be $719,484.20 — and that the trust should bear a zero per cent equitable share. The jury also found that under the 1988 agreement TJA had agreed to indemnify the trust for the release of hazardous material that occurred during the full term of the lease; the total damages awarded by the jury on this contract claim were $796,612.82. Finally, based on the jury's allocation of response costs to the years they were incurred, the judge determined the amount of prejudgment interest to be paid by Fisher Delaware II on the response costs for which it was responsible under § 4, and to be paid by TJA on the response costs for which it was responsible under the contract claim. Following the entry of judgment in accordance with the jury's verdict,[15] the judge granted TJA's motion for judgment

---

[13]The trustees did not appeal from this decision. Accordingly, there is no claim before us concerning response costs paid before July 1, 1989, or relating to alleged property damage under G. L. c. 21E, § 5.

[14]The G. L. c. 21E, § 4, claims were tried against JAC, TJA, and Fisher Delaware II; the trustees dismissed their § 4 claims against IL Co., Thermo Electron, Allied, and Allied-Signal before trial began. At the close of the trustees' case, the trial judge directed verdicts in favor of JAC and TJA on the § 4 claims.

[15]The amounts awarded by the jury against Fisher Delaware II under § 4

notwithstanding the verdict (judgment n.o.v.) on the contract claim.

In October, 2002, the same judge conducted a jury-waived trial to determine the trustees' entitlement to attorney's fees under G. L. c. 21E, § 4A (*d*), and the claims of several defendants for attorney's fees under § 4A (*f*). The judge found that the trustees were entitled to attorney's fees under § 4A (*d*), to be paid by Fisher Delaware II; and that Thermo Electron, but none of the other defendants, was entitled to attorney's fees under § 4A (*f*). The judge later amended his judgment to conclude that none of the defendants was entitled to attorney's fees under § 4A (*f*). The judge also awarded fees to the trustees under § 15, to be paid by Fisher Delaware II. Both the trustees and the defendants have appealed. We granted Thermo Elemental's application for direct appellate review.

2. *Breach of contract claim.* The trustees appeal from the allowance of TJA's motion for entry of judgment n.o.v. on their contract claim for indemnification under their 1988 agreement with TJA.

a. *Background.* In March of 1986, AHSPC was the lessee under the lease with the trust. On March 28, 1986, TJA, a subsidiary of Thermo Electron, purchased AHSPC's scientific instrument manufacturing business operated on the property. AHSPC and TJA also executed an assignment of the lease, to which the trustees assented. TJA thus assumed all the lessee's rights, duties, and liabilities as defined in the lease.

The lease, with its commencement date of August 2, 1963, had been extended once pursuant to one of two extension options, and was set to expire on April 1, 1989, if not extended for an additional five years under the second extension option. In 1987, TJA decided to move all its manufacturing operations to Franklin, and thus no longer intended to use the property in Waltham

(Count II of the amended complaint) covered the same response costs that were awarded against TJA under the contract claim based on the indemnity provision in the 1988 agreement (Count IV of the amended complaint). The latter amounts were larger than the former because some of the response costs claimed against Fisher Delaware II were barred by the statute of limitations applicable to § 4 claims, but this limitations period did not affect the contract claim against TJA. The final judgment specified that there was to be no double recovery by the trustees.

that was the subject of the lease. At some point in late 1987 or early 1988, representatives of TJA approached the trustees to suggest an early termination of the lease, an occurrence that would also benefit the trust because of the fixed rental amounts prescribed in the 1963 lease. The parties then negotiated an agreement to end the lease. Thomas Dusel was the principal negotiator for the trust, and Earl Lewis served as the primary negotiator for TJA. Dusel and Lewis worked out the substantive business terms of the agreement, but the actual drafting was left to lawyers representing the respective parties: Thomas Taylor, of the law firm of Hill & Barlow, for the trust, and for TJA, Sandra Lambert, an in-house counsel for Thermo Electron. The parties executed the agreement on March 30, 1988.

The agreement recites that it is made between the trustees as lessor and TJA as lessee. It further recites that the parties, or their predecessors in interest, "entered into a certain lease dated August 2, 1963 (the 'Lease') respecting the premises now known as 590 Lincoln Street . . . (the 'Premises')," and that the parties wish to terminate the lease "prior to the expiration of its stated term." The indemnification provision relating to the release of hazardous materials, set out as a separate paragraph of the agreement, reads as follows:

> "3. Lessee shall save Lessor harmless and indemnify (and shall defend Lessor with counsel reasonably approved by Lessor) against any claim, loss or cost arising out of any release of hazardous materials arising out of Lessee's use or activities of Lessee, its employees and agents on the Premises during the term of the Lease in violation of [certain Federal and State environmental protection statutes and regulations, including G. L. c. 21E]. This provision shall not impose any requirement on Lessee with respect to activities off the Premises that result in a violation of any of [the listed environmental statutes or regulations] on or under the Premises without any involvement of Lessee, its employees or agents or with respect to conditions existing on, under or around the Premises prior to the Lease commencement date."

The trustees' position is that this provision, read as a whole, commits TJA to indemnify the trust with respect to any release

of hazardous material resulting from a lessee's activities on the property at any point during the lease term — that is, at any time between the commencement of the lease in 1963 up to its termination in 1988. TJA, on the other hand, contends that (1) the provision restricts the proffered indemnification solely to releases resulting from TJA's activities on the site during the two years of its tenancy, 1986 to 1988; and (2) because there was no evidence that TJA's operations on the site during this time caused any release of TCE or any other hazardous material to·occur,[16] the indemnity provision was not triggered. By their verdict in favor of the trustees on the contract claim, it is clear that the jury accepted the broader interpretation of the indemnity provision advanced by the trustees; by granting TJA's motion for judgment n.o.v., the judge sided with TJA's more narrow view.

In his decision allowing the motion, the judge concluded that the words of the agreement were unambiguous.[17] He began his analysis by a review of some evidence presented at the trial concerning the negotiations over the agreement. After reciting the evidence presented through TJA's lawyer Sandra Lambert about her purpose in proposing language that the indemnification was to be for releases of hazardous materials "arising out of Lessee's use or activities of Lessee, its employees or agents on the Premises" — language that appears in the executed version of the agreement — the judge concluded that the plain meaning of this phrase was, as Lambert had testified, to restrict the scope of the indemnification to releases occurring during TJA's own tenancy. In accordance with that conclusion, the judge opined that the reference, in the same sentence of the indemnity provision, to the "term of the Lease," as well as the later exception for hazardous waste conditions existing on the property "prior to the Lease commencement date," represented "surplusage" and "excess verbiage" that needed to yield to the true intention of the parties

---

[16]As mentioned, at the close of the trustees' evidence at trial, the judge directed a verdict in favor of TJA on the trustees' claim that TJA was responsible for any release of TCE. The trustees have not appealed from this determination.

[17]The judge acknowledged that in reaching this decision he came to a result contrary to one reached before trial, when another judge had ruled that the language of the agreement's indemnification provision was ambiguous, and had accordingly denied the parties' cross motions for summary judgment on the contract claim.

as evidenced by a review of the contract as a whole, which, in his view, was to confine the indemnity to releases caused by TJA's own activities on the premises.

b. *Discussion.* The issue presented by the trustees' appeal, in the first instance, is whether the indemnity provision in the agreement is ambiguous. Determining the existence of a contract ambiguity presents a question of law for the court; when a trial judge undertakes the interpretation of an unambiguous contract, the judge's ruling is subject to plenary review on appeal. See, e.g., *President & Fellows of Harvard College* v. *PECO Energy Co.*, 57 Mass. App. Ct. 888, 891 (2003). See also *Berkowitz* v. *President & Fellows of Harvard College*, 58 Mass. App. Ct. 262, 270 (2003). To answer the ambiguity question, the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties. See *General Convention of the New Jerusalem in the U.S., Inc.* v. *MacKenzie*, 449 Mass. 832, 835-836, 838 (2007). "Contract language is ambiguous 'where the phraseology can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken.' " *President & Fellows of Harvard College* v. *PECO Energy Co.*, *supra* at 896, quoting *Suffolk Constr. Co.* v. *Lanco Scaffolding Co.*, 47 Mass. App. Ct. 726, 729 (1999). See *In re Navigation Tech. Corp.*, 880 F.2d 1491, 1495 (1st Cir. 1989).

In the present case, an examination of the language used in the agreement's indemnity provision indicates the existence of an ambiguity. The indemnity provision begins by stating that "Lessee" is to hold "Lessor" harmless "against any claim, loss or cost arising out of any release of hazardous materials *arising out of Lessee's use or activities of Lessee, its employees and agents on the Premises during the term of the Lease*" (emphasis supplied). Given that TJA is identified in the first paragraph of the agreement as "Lessee," and further that TJA was lessee only from 1986 to the lease termination date in 1988, the first part of this sentence appears at first blush to limit the promised indemnification to TJA's use of and activities on the premises during the two years of its own tenancy.[18] However, the inclu-

---

[18]See, however, note 19, *infra.*

sion of the phrase "during the term of the Lease" in the same sentence suggests a period of time going back to 1963, when the "Lease" — a defined term in the agreement referring to the "certain lease dated August 2, 1963" — began. The quoted sentence taken as a whole, therefore, at least raises the possibility that the indemnification being granted by TJA was to cover releases of hazardous materials caused by *any* lessee's activities on, and uses of, the leased premises during the entire lease term.

That this possibility is indeed what the sentence was intended to convey finds support in the final sentence of the indemnity provision, which explicitly carves out two exceptions from the scope of the indemnification. The first exception is for activities taking place off the leased premises resulting in the release of hazardous wastes on or under those premises; the second, and the one of particular relevance here, is for "conditions existing on, under or around the Premises *prior to the Lease commencement date*" (emphasis supplied). The "Lease commencement date" again appears to be a reference to August 2, 1963, the commencement date of the defined term "Lease." As the trustees point out, if indeed the earlier sentence in the indemnity provision that concerns the "Lessee's use or activities of the Lessee . . . on the Premises" was meant to limit the indemnification to TJA's own activities while it was the lessee, there would be no need to carve out this second exception for activities occurring prior to 1963 — more than twenty years before TJA's tenancy began.

By considering the language against the backdrop of a portion of the trial evidence, the judge relied, at least in part, on extrinsic evidence to conclude that there was no ambiguity in the contract to begin with. But extrinsic evidence may be used as an interpretive guide only after the judge or the court determines that the contract is ambiguous on its face or as applied. See *General Convention of the New Jerusalem in the U.S., Inc.* v. *MacKenzie*, 449 Mass. at 835-836. It is not to be used as the basis for concluding in the first instance that a contract is unambiguous as matter of law. See *id.* at 836.

The indemnity provision unquestionably contains language that supports an interpretation restricting the indemnity to releases

caused only by TJA. Moreover, as the judge pointed out, the agreement identifies TJA as the "Lessee" in its first paragraph, uses the term "Lessee" over twenty times, and in all sections of the agreement other than the indemnity provision, the "Lessee" being referred to is clearly only TJA. Accordingly, the trustees' argument that in certain portions of this provision, the parties used the term "Lessee" to include not only TJA but the earlier lessees as well, appears at first blush to be quixotic. However, the trustees are correct that the term "Lessee" is not formally defined in the agreement, in contrast to terms such as "Lease," "Premises," and "Termination Date," and although "words used in one undoubted sense in one place [in a will, contract, or statute] may be presumed to be used in the same meaning in another place in the writing," *Clark* v. *State St. Trust Co.*, 270 Mass. 140, 151 (1930), this rule itself "is an aid and not an end. It is generally to be followed but it is not inflexible. It yields to the main purpose, which is to find out what the writing means as a whole." *Id.* Accord *Chapman* v. *Katz*, 448 Mass. 519, 528 n.20 (2007).[19] In this case, the indemnification provision "as a whole" contains some language that suggests the indemnification was intended to cover hazardous material releases

---

[19]Moreover, it is at least possible to read the language of the indemnity provision in a way that does restrict the meaning of the word "Lessee" to TJA, but nonetheless supports the view that the proffered indemnity covers contamination caused by earlier lessees. The indemnity provision states that the obligation to indemnify applies to any hazardous material release "arising out of Lessee's use *or activities of Lessee, its employees and agents* on the Premises *during the term of the Lease*" (emphasis supplied). It also states that no requirement to indemnify is imposed "on Lessee with respect to activities off the Premises that result in [a hazardous material release] without any involvement of *Lessee, its employees or agents*" (emphasis supplied). These are the only two references to the "Lessee, its employees or agents" — as opposed to simply the "Lessee" — in the entire agreement. In light of the series of interconnected corporate mergers, asset purchases, and name changes among the various lessees of the property, and evidence that to some extent, the employees on the site did not change despite the corporate changes, it would not be unreasonable to construe the phrase "Lessee, its employees and agents" as referring to TJA and its predecessor lessees, rather than just TJA. Given such a reading, all the words of the indemnity provision can be read consistently to mean that TJA, as the "Lessee" in the agreement, is obligated to indemnify the trustees for releases arising from its own use of the property and also from activities conducted by the earlier lessees. Such a reading does "no violence to the language" of the agreement as a whole. *Chapman* v. *Katz*, 448 Mass. 519, 528 n.20 (2007).

by any of the lessees. In the circumstances, it was error for the judge to rule as matter of law that the agreement unambiguously restricted the indemnification provision to TJA's activities alone. The meaning of this provision, and the scope of the indemnity being provided in particular, presented a question of fact to be decided by the fact finder — in this case, the jury. See *Seaco Ins. Co.* v. *Barbosa*, 435 Mass. 772, 779, 781 (2002).

Near the end of his ruling, the judge turned briefly to a review of the sufficiency of the trial evidence. He determined that the only reasonable conclusion this evidence permitted was that the indemnity provided by the agreement covered solely TJA's activities on the site during its two-year tenancy. If the judge's determination was correct, then the error concerning the agreement's non-ambiguity would be immaterial. See *Suffolk Constr. Co.* v. *Lanco Scaffolding Co.*, 47 Mass. App. Ct. 726, 731 (1999) (where trial evidence on meaning of arguably ambiguous contract language was insufficient to support interpretation chosen by jury, judgment n.o.v. should have been granted). However, the judge was not correct.

Our standard for reviewing a motion for judgment n.o.v. is "whether, 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the [other party].' " *Masingill* v. *EMC Corp.*, 449 Mass. 532, 543 (2007), quoting *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972). It is true that Sandra Lambert's testimony about her conversations with the trustees' attorney, Thomas Taylor, concerning the limiting language she proposed for the indemnification provision was not "controverted," because Taylor did not testify at trial. Nevertheless, the jury were not obliged to accept what Lambert said, in whole or in part. See, e.g., *Calderone* v. *Wright*, 360 Mass. 174, 176 (1971); *Lydon* v. *Boston Elevated Ry.*, 309 Mass. 205, 206 (1941). Countervailing evidence certainly was before the jury. In particular, there was evidence presented by *both* Thomas Dusel, the trustee who had negotiated the business terms of the agreement for the trust, *and* Earl Lewis, Dusel's TJA counterpart negotiator,[20] that when the two men discussed the business terms of the agreement before it was drafted, Dusel

---

[20]At trial, Lewis's deposition testimony was read to the jury; Lewis did not

made it clear that he wanted an indemnification provision covering any release of hazardous material by any of the lessees during the entire term of the 1963 lease, and that he and Lewis specifically agreed to this extended indemnity because TJA itself was indemnified by one of the preceding lessees, AHSPC. Lewis further testified that he was certain that before any drafting, he talked to Lambert about what the terms of his agreement with Dusel were — "what I thought we were agreeing to." In this regard, he also stated that he must have said to Lambert that the trustees wanted a broad indemnity and that he had explained to Dusel the fact that TJA itself was indemnified by AHSPC. The jury were free to credit this testimony (as well as other supporting evidence presented[21]), and ultimately to resolve the ambiguities in the indemnification provision in a way that was consistent with the business terms testified to by Dusel and Lewis: the indemnification being provided by TJA as the "Lessee" extended back through the entire "term of the Lease," but did not reach "conditions existing on, under or around the Premises prior to the Lease commencement date." TJA's motion for judgment n.o.v. should not have been allowed.

3. *Trustees' compliance with the Massachusetts Contingency*

testify as a live witness. The deposition had been taken October 30, 1998.

[21]For example, there was evidence that when they were negotiating the terms to govern the agreement, Dusel and Lewis both understood that the 1963 lease contained an indemnification provision covering releases by all lessees. The jury also heard from Dusel that he discussed a draft of the agreement with the trustees' attorney Taylor, and Dusel understood that the final version of the agreement, the one he signed, did indeed provide indemnification for releases going back to the beginning of the lease: the language "during the term of the Lease" that appeared in the indemnification provision of the agreement meant just that. Lewis, on the other hand, testified that he did not remember reviewing or discussing with Lambert any written drafts of the agreement or the final written version before he signed it. There was also evidence — again proffered by *both* Dusel and Lewis — that for the period of time extending from the signing of the agreement in the spring of 1988 up until 1992 (when a different lawyer for TJA became involved), TJA responded to the trustees' requests for payment of remediation costs not by denying any responsibility, but instead by referring to the indemnification that AHSPC had provided to TJA — in other words, in a manner consistent with Lewis' position that TJA could offer a broad indemnity to the trustees because TJA was in turn indemnified by AHSPC. In seeking to interpret the scope of the agreement's indemnity provision, the jury were entitled to consider this evidence concerning the parties' conduct following execution of the agreement. See, e.g., *Keating* v. *Stadium Mgt.Corp.*, 24 Mass. App. Ct. 246, 251-252 (1987).

*Plan.* The defendants appeal from the judgment entered against Fisher Delaware II on the trustees' claim under G. L. c. 21E, § 4. They begin with a claim that judgment cannot stand because the undisputed evidence shows the trustees did not comply fully with all requirements of the Massachusetts Contingency Plan (MCP).

General Laws c. 21E imposes liability for the release of hazardous material on a number of parties, including the owner of the property on which the release occurs, and anyone who caused the release. G. L. c. 21E, § 5 (*a*). Liable property owners are encouraged to undertake their own "response actions" to assess, contain, and remove any hazardous materials on affected property. G. L. c. 21E, § 4. Failure to do so may result in liability for any later response actions conducted by the Commonwealth, as well as treble damages. G. L. c. 21E, § 5 (*a*), (*e*). Any private party who undertakes such a response action may then seek contribution from other potentially liable parties. G. L. c. 21E, §§ 4, 4A.

"Simply put, G. L. c. 21E was drafted in a comprehensive fashion to compel the prompt and efficient cleanup of hazardous material and to ensure that costs and damages are borne by the appropriate responsible parties. To that end, the department has promulgated extensive regulations, known collectively as the Massachusetts Contingency Plan . . . for purposes of implementing, administering, and enforcing G. L. c. 21E." *Taygeta Corp.* v. *Varian Assocs.*, 436 Mass. 217, 223 (2002). The purpose of the MCP is, among other things, to "provide for the protection of health, safety, public welfare and the environment" by encouraging "persons responsible for releases . . . of . . . hazardous material to undertake necessary and appropriate response actions in a timely way." 310 Code Mass. Regs. § 40.0002 (1995).[22]

The defendants argue that the private right of action created

___

[22]This language is quoted from the Massachusetts Contingency Plan (MCP) in effect after 1993. The MCP was substantially revised in 1993. See 310 Code Mass. Regs. § 40.0005 (1995). One of the trust's alleged violations of the MCP occurred before 1993 and one occurred after. The purpose of the earlier version of the MCP was limited to establishing "requirements and procedures for the discovery, notification, assessment of, and response to, releases and threats of release of oil or hazardous materials," and to identifying the "roles and responsibilities" of potentially responsible parties, govern-

in § 4 requires strict compliance with the MCP. In support of this position, the defendants cite the provision, found in G. L. c. 21E, § 4:

> "Nothing in this section shall preclude assessment, containment and removal by any person threatened or damaged by such release or threat of release, provided such assessment, containment and removal is conducted in accordance with the Massachusetts contingency plan and consistently with the assessment, containment and removal actions conducted by the department."

G. L. c. 21E, § 4, second par. They argue that because the trustees failed to comply strictly with the requirements of the MCP, they are completely barred from recovery of response costs under § 4.

The defendants identify two respects in which the trust's response action failed to conform to the requirements of the MCP. The first concerns an assessment report prepared for the trust in 1991 by Haley & Aldrich, entitled, "Phase II — Comprehensive Site Assessment." The 1988 MCP required all phase II comprehensive site assessments to include a section called a "scope of work," 310 Code Mass. Regs. § 40.545(1)(b) (1988), that was supposed to contain, among other things, a schedule for implementation of the phase II comprehensive site assessment, a sampling plan and analytical protocols, a quality assurance control plan, and a health and safety plan. See 310 Code Mass. Regs. § 40.545(2) (1988). According to the defendants, the comprehensive site assessment report prepared for the trust did not include a scope of work section, in violation of the provisions in the MCP then in effect.

The second claimed violation concerned work done at the site after the expiration of a "Waiver of Approvals." Under the 1988 version of the MCP, in an attempt to streamline G. L. c. 21E's cleanup process, the department began granting waivers to low-risk cleanup operations, allowing them to proceed through the multiple cleanup phases outlined in the MCP without

ment agencies, and the public in response actions. 310 Code Mass. Regs. § 40.002 (1989). The 1993 revisions maintained this purpose, but added many more, including the language quoted above.

obtaining the required department approval for each successive phase. 310 Code Mass. Regs. §§ 40.536, 40.537 (1988). As a low-risk site, the trust received such a waiver in 1989. The waiver expired on February 28, 1994, but the response action continued after that date. The department informed the trust that the response actions taken after the expiration of the waiver were "conducted in non-compliance" with G. L. c. 21E and the MCP.

The defendants assert that these two violations of the MCP preclude the trust from recovering any response costs incurred after October 3, 1988, when the MCP first went into effect.

General Laws c. 21E, § 4, speaks to the performance of response actions to assess, contain, or remove a release of hazardous material. In the first paragraph, the department is "authorized" to undertake or arrange for "such response actions as it reasonably deems necessary . . . by reference to the [MCP]." The second paragraph focuses on private parties, providing that "[n]othing in this section shall preclude assessment, containment and removal by any person threatened or damaged by [a] release" of oil or hazardous material to undertake an "assessment, containment and removal" of the contamination, "provided such assessment, containment and removal is conducted in accordance with the [MCP] and consistently with assessment, containment and removal actions conducted by the department." The third paragraph of § 4 then provides in relevant part:

> "Any person who undertakes a necessary and appropriate response action regarding the release or threat of release of oil or hazardous material shall be entitled to reimbursement from any other person liable for such release or threat of release for the reasonable costs of such response action. . . . All claims and actions for contribution, reimbursement or equitable share by persons other than the commonwealth pursuant to this paragraph, except those pending in court on the effective date of section four A shall be subject to, and brought in accordance with, the procedures set forth in section 4A."

We have consistently and specifically identified this third paragraph of § 4 as the statutory authorization for the type of pri-

vate response cost recovery lawsuit that the trustees have brought here. See, e.g., *Commonwealth* v. *Boston Edison Co.*, 444 Mass. 324, 343 (2005); *Mailman's Steam Carpet Cleaning Corp.* v. *Lizotte*, 415 Mass. 865, 874 (1993). The only condition this paragraph imposes on a private party's recovery of such costs is that the response action undertaken be "necessary and appropriate," that the costs be "reasonable," and that the private party follow the presuit notice and settlement procedures set out in § 4A. Compliance with the MCP is not mentioned.[23] That does not mean that the MCP is irrelevant. When the second paragraph of § 4 is read together with the third — as rules of statutory construction propose they should be, see, e.g., *Wolfe* v. *Gormally*, 440 Mass. 699, 704 (2004); *Negron* v. *Gordon*, 373 Mass. 199, 201 (1977) — the reasonable conclusion is that the MCP helps to define the contours of "a necessary and appropriate response action" described in the third paragraph of § 4. But looking to the MCP for assistance in determining what is "necessary and appropriate" in terms of a response to the release of hazardous material does not mean that exact compliance with every detail of the MCP operates as a condition precedent to recovery of *any* response costs. If the Legislature had wanted to make strict adherence to the MCP such a condition, it could have done so; the reference to the MCP in the second paragraph of § 4,[24] its absence in the third paragraph, and the use of the phrase "necessary and appropriate" instead, indicates that the Legislature did not have this intent.[25] See, e.g., *Fontaine* v. *Ebtec Corp.*, 415 Mass. 309, 321 (1993), quoting *Hartford Ins. Co.* v. *Hertz Corp.*, 410 Mass.

---

[23]In this respect, § 4 differs from G. L. c. 21E's Federal analogue, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), which specifically allows a private party to recover response costs incurred that are "consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B) (2000).

[24]It bears noting that § 4's second paragraph itself does not use the terms "strict compliance" or "exact compliance" with the MCP.

[25]As the trustees and the Commonwealth point out, acceptance of the defendants' interpretation of § 4 could serve to discourage private parties from undertaking cleanup actions on their own in response to hazardous material contamination, because any mistake or misstep in meeting the MCP's requirements, no matter how insignificant or immaterial, would preclude the parties from obtaining any reimbursement or cost-sharing from other private parties who were responsible in whole or in part for the contamination. As noted, two of the purposes of G. L. c. 21E are to "compel the prompt and efficient

279, 283 (1991) ("As a general rule, when the Legislature has employed specific language in one part of a statute, but not in another part which deals with the same topic, the earlier language should not be implied where it is not present"). See also *Mystic Landing, LLC* v. *Pharmacia Corp.*, 443 F. Supp. 2d 97, 107 (D. Mass. 2006) ("There is no indication that full compliance with the MCP is a statutory condition precedent to recovery of response costs under Chapter 21E, § 4").

For support of their claim, the defendants cite *Black* v. *Coastal Oil New England, Inc.*, 45 Mass. App. Ct. 461, 462 n.3 (1998) (*Black I*), S.C., 57 Mass. App. Ct. 696, 697 n.2 (2003) (*Black II*), a case involving a claim by property owners to recover from the defendant oil company for both response costs under G. L. c. 21E, § 4, and damage to their personal property under c. 21E, § 5. *Black I, supra* at 462. The issues before the Appeals Court concerned a judge's damage award under § 5 for diminution of the property's market value and the award of attorney's fees under c. 21E, § 15. *Black II, supra* at 697. In each *Black* decision, the Appeals Court noted in a footnote that with respect to the § 4 response costs, the judge had determined that the plaintiffs had incurred costs but had failed to comply with the MCP, which went into effect during the time they were carrying out the response action, and the judge had limited the plaintiffs' response recovery to response costs incurred before the effective date of the MCP. *Black II, supra* at 697 n.2. *Black I, supra* at 462 n.3. However, the *Black* plaintiffs apparently did not challenge the judge's limitation of their § 4 recovery, as there is no substantive discussion in either of the Appeals Court's opinions concerning the issue, and no mention of what the MCP violations were. Nothing in either opinion suggests that every violation of the MCP results in forfeiture of the right to recover all response costs. The *Black* decisions do not aid the defendants' argument in any material respect.

Furthermore, although the failure of a response action to comply with the MCP might, in some circumstances, tend to show

cleanup of hazardous material and to ensure that costs and damages are borne by the appropriate responsible parties." *Taygeta Corp.* v. *Varian Assocs.*, 436 Mass. 217, 223 (2002). See *Sanitoy, Inc.* v. *Ilco Unican Corp.*, 413 Mass. 627, 629-630 (1992). Reading § 4 as the defendants propose would run contrary to both these goals.

that it was not necessary or appropriate, or that the costs incurred were not reasonable, this case does not present such a circumstance. The defendants do not point to any way in which the claimed MCP violations compromised or negatively affected their response to the TCE contamination.[26] The question whether the response action was necessary and appropriate, with reasonable costs, was a factual one properly left to the jury in this case. The jury heard the evidence presented at trial of the MCP violations, yet still found that the trust's response action met the necessary and appropriate standard.

The defendants also challenge the judge's jury instruction on this issue. The judge instructed the jury that the trustees' response action must be reasonable, and incurred for services that were "necessary and appropriate." He went on to define "necessary and appropriate" as conducted "in accordance with the MCP," and explained that "[t]he burden is on the plaintiff to show by a preponderance of the evidence that its response action was conducted in accordance with the MCP." The judge explained that to be conducted "in accordance" with the MCP does not require "strict compliance or perfection." He further explained:

> "An immaterial or insubstantial deviation from the MCP would not mean that the response action was not conducted in accordance with the MCP.
>
> "The question for you on this point is whether the trust deviated in some material way from the MCP as to any part of its response action. If the answer is yes, then it will be up to you to determine what effect that should have on the trust's claim for response costs. If you have found that there was a deviation which increased the cost of the response action, for example, because non-compliant work was done and charged for that otherwise would not have been done and charged for, or because additional work was required to correct any non-compliant portion of the trust action — those are just examples — then any such

[26]For example, the defendants do not cite any deficiencies or expenses in the response action that would have been prevented if a scope of work had been prepared. And as to the "waiver" violation, it is significant that even after the department learned of this violation, the department chose to do nothing about it.

> additional costs should be deducted from the trust's claim for response costs because they were not pursuant to a necessary and appropriate response action."

The defendants argue that this instruction allowed the trustees to recover for even material deviations from the MCP. The defendants misinterpret the instruction. The import of the judge's words were that over-all, substantial compliance with the MCP was required in order to demonstrate that the trust had conducted a response action that was "in accordance with the MCP." This instruction expresses accurately the thrust of the authorizing language in the third paragraph of § 4, and if anything, is more favorable to the defendants than the statute required, insofar as it expressly defines a "necessary and appropriate" response action in terms of substantial compliance with the MCP, rather than presenting such compliance as one, albeit highly significant, criterion to consider. There was no error.

4. *Attorney's fees as response costs.* The defendants also challenge the allowance, as a type of permissible response costs, of fees paid by the trust to its attorneys for work on the response action. Under G. L. c. 21E, § 4, one who undertakes a "necessary and appropriate response action" is "entitled to reimbursement from any other person liable for such release . . . for the reasonable costs of such response action." A "response action" is defined to include assessment, containment, and removal, and "assessment" is defined to include, "without limitation, studies, services and investigations to plan, manage and direct assessment, containment and removal actions, to determine and recover the costs thereof, and to otherwise accomplish the purposes of this chapter." G. L. c. 21E, § 2.

The jury awarded the trustees $90,214 for work undertaken by their attorneys, Hill & Barlow, to manage the response action. The judge instructed the jury that "[s]ervices provided by a lawyer in connection with an environmental case may or may not qualify as response costs. To be recoverable as response costs, attorney's fees must be for services that are closely tied to the response action . . . ."

This instruction accurately reflected the requirements of G. L. c. 21E. There is nothing in the statute to exclude otherwise

legitimate response costs simply because they relate to services provided by an attorney. As with any other response cost, attorney's fees must be reasonable, necessary, and appropriate to be recoverable under G. L. c. 21E, § 4, and the judge properly instructed the jury on this point. The judge further directed the jury to include only those attorney's fees that were "closely tied to the response action," and to deduct any Hill & Barlow fees for litigation-related activity. These instructions ensured that the only attorney's fees included in the § 4 award would be legitimate response costs, not litigation costs that could only be recovered, if at all, under G. L. c. 21E, § 4A (*d*) or 15.

The United States Supreme Court has interpreted the analogous provision in the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9607 (2000), in much the same manner, holding that "some lawyers' work that is closely tied to the actual cleanup may constitute a necessary cost of response." *Key Tronic Corp.* v. *United States*, 511 U.S. 809, 820 (1994).[27] See *Martignetti* v. *Haigh-Farr, Inc.*, 425 Mass. 294, 301 n.12 (1997) ("To the extent that there are similarities in language and structure [between G. L. c. 21E and CERCLA], it is desirable to arrive at similar interpretations . . .").

The defendants argue that, according to this court's decision in *Sanitoy, Inc.* v. *Ilco Unican Corp.*, 413 Mass. 627, 630 (1992), the judge's instruction was in error because no attorney's fees may be recovered as part of § 4's response costs. The defendants' argument is without merit. The court in *Sanitoy* held that § 4 contains "no provision for the recovery of attorneys' or expert witness fees by parties seeking reimbursement." *Id.* That holding concerns only attorney's fees related to the conduct of the litigation, and is limited to a prohibition on recovery of those

---

[27]CERCLA includes a somewhat broader definition of a "response action," including not only removal and remedial action, but also "enforcement activities related thereto." 42 U.S.C. § 9601(25). However, the United States Supreme Court in *Key Tronic* did not rely on the broader "enforcement activities" language to support its conclusion that some attorney's fees may be recoverable under § 9607 of CERCLA. *Key Tronic Corp.* v. *United States*, 511 U.S. 809, 820 (1994). See *Neumann* v. *Carlson Envtl., Inc.*, 429 F. Supp. 2d 946, 959-960 (N.D. Ill. 2006); *Nutrasweet Co.* v. *X-L Eng'g Corp.*, 926 F. Supp. 767, 771 (N.D. Ill. 1996).

fees under § 4. The court in that case had no occasion to, and did not, consider attorney's fees as one type of response costs.

The defendants also object to the specific items represented on Hill & Barlow's billing records, arguing that even if some attorney's fees might be recoverable as response costs, the objected-to fees were clearly neither necessary nor appropriate, and the jury's conclusion to the contrary requires reversal.[28] Whether any individual charge was related to litigation or to response costs was a factual question for the jury to decide. The disputed billing records include entries such as "Telephone conference with T. Dusel re: Therm Meeting," and "Attention to Therm claim; review CERCLA cases, chronology of events and corporation transactions, and 21E amendments." According to the defendants, these entries could relate only to the indemnity claim the trustees intended to litigate, and could not be considered as necessary and appropriate management costs of the response action. The defendants read the entries too narrowly. The jury would have been warranted to conclude that a 1991 discussion with Thermo Electron, the parent of a former tenant of the site, at a time when the source of the contamination was still uncertain, was related to the response action. Similarly, the jury could have concluded that research into G. L. c. 21E and CERCLA was related to the response action itself and not the subsequent litigation.[29] Furthermore, the jury also heard expert testimony that the work done by Hill & Barlow was necessary and appropriate, closely tied to the response action, and typical of response work carried out by attorneys in situations such as this one. There was sufficient evidence in the record to support the jury's conclusions regarding Hill & Barlow's fees.

---

[28]The defendants further argue that the records were improperly admitted hearsay because, having been redacted in preparation for litigation, they were not created in the ordinary course of business and therefore failed to conform to the requirements of the business records exception. See G. L. c. 233, § 78. The defendants' argument fails because, as the judge determined, the records themselves were ordinary invoices plainly prepared in the ordinary course of business. Redacting a business record in preparation for litigation does not change the fact that the record was originally prepared in the ordinary course of business.

[29]Richard Rudman, the Hill & Barlow attorney primarily responsible for providing the legal response action services at issue, testified at length concerning the response-related work he performed, and the defendants had an opportunity to question him about the specific bills they now challenge.

5. *Prejudgment interest.* The judge ordered Fisher Delaware II to pay prejudgment interest on the jury's awards of response cost damages against it. To calculate the amount of interest owed, the judge instructed the jury to allocate the trust's response costs, as evidenced in more than 180 invoices, to the calendar year in which the particular work was done. At trial, Dusel testified that MMBT (the sole beneficiary of the trust) received the trust's response-related bills and paid them within ninety days of receiving each invoice. MMBT later charged those costs back to the trust's account through subsequent bookkeeping entries. The judge assessed interest as of December 31 of each year to which the jury had assigned costs. The defendants argue that the judge's calculation of interest was error because the evidence presented at trial established only the date the debts were incurred and MMBT's practice of paying the bills within ninety days. According to the defendants, prejudgment interest must be measured from the date a bill was paid by the trust, not the date a debt was incurred by it or paid by MMBT, and there was no evidence presented at trial concerning when the response costs were eventually charged against the trust's account. Therefore, the defendants argue, the awards of prejudgment interest must be reversed.

An award of prejudgment interest is made "so that a person wrongfully deprived of the use of money" is "made whole for his loss." See *Sterilite Corp.* v. *Continental Cas. Co.*, 397 Mass. 837, 841 (1986), quoting *Perkins Schs. for the Blind* v. *Rate Setting Comm'n*, 383 Mass. 825, 835 (1981). When applying G. L. c. 231, §§ 6B and 6C, "the fact that no loss was incurred until after an action was commenced should be recognized, as a matter of fairness, in order to avoid giving a party an undeserved windfall."[30] *St. Paul Surplus Lines Ins. Co.* v. *Feingold & Feingold Ins. Agency, Inc.*, 427 Mass. 372, 377 (1998). Thus, when expenses incurred as a result of a contract breach are not paid

---

[30]General Laws c. 231, § 6B, provides for prejudgment interest in tort actions, and G. L. c. 231, § 6C, provides the same in relation to contract actions. The same principles govern the calculation of prejudgment interest under both statutes. See *St. Paul Surplus Lines Ins. Co.* v. *Feingold & Feingold Ins. Agency, Inc.*, 427 Mass. 372, 377 (1998) (calculation of prejudgment interest on tort claim under G. L. c. 231, § 6B); *Sterilite Corp.* v. *Continental Cas. Co.*, 397 Mass. 837, 841-842 (same in connection with contract claim under G. L. c. 231, § 6C).

by a plaintiff until after the breach has occurred, the interest is calculated not from the date of the breach or even the date the action was commenced, as the plain language of the statute would require, but from the date or dates on which the plaintiff made such payments. See *Sterilite Corp.* v. *Continental Cas. Co., supra* at 841-842. This avoids the windfall that would otherwise be created for the plaintiff were courts to allow interest to accrue from the date of breach even when the plaintiff does not lose the use of funds until much later. See *id.*

The facts of this case present a similar dilemma. An application of the plain language of the statute would allow interest to accrue "from the date of commencement of the action" or "from the date of the breach," G. L. c. 231, §§ 6B and 6C, but most costs were not paid by the trust until much later. The judge recognized the potential windfall for the trust, and avoided that result by calculating interest from the last day of the year in which each bill was paid by MMBT. This approximation avoided using the more than 180 different dates of accrual that would have been required for a more precise calculation based on the actual dates the invoices were paid. See *O'Malley* v. *O'Malley*, 419 Mass. 377, 381 (1995) (calculating § 6C interest owed over multi-year period as of each year's end). The approximation would also almost certainly undercharge Fisher Delaware II, because there was testimony that all bills were paid within ninety days of receipt of an invoice, and most were paid within thirty days. As to the defendants' contention that prejudgment interest could only run from the dates that MMBT charged back the response costs to the trust, and not when they were paid by MMBT, we conclude that in the circumstances of this case, where MMBT owned the entire beneficial interest of the trust, and also managed the books and accounts for the trust, the approximation employed by the judge fairly reflected the legislative purpose of G. L. c. 231, §§ 6B and 6C.[31]

6. *The defendants' litigation fees.* The defendants challenge the judge's denial of attorney's fee awards to any of them under G. L. c. 21E, § 4A (*f*). Section § 4A (*f*) provides:

"If the court finds that (1) the plaintiff did not partici-

---

[31]This method of calculating interest is equally applicable to the trustees' contract claim.

pate in negotiations or dispute resolution in good faith; (2) the plaintiff had no reasonable basis for asserting that the defendant was liable, or (3) the plaintiff's position with respect to the amount of the defendant's liability pursuant to the provisions of this chapter was unreasonable, it shall award litigation costs and reasonable attorneys' fees to the defendant."

In their response to the trustees' § 4A demand letter, Thermo Electron and TJA asserted their intention of seeking attorney's fees under § 4A (*f*). Similarly, in their answer to the trustees' original complaint, Thermo Electron and TJA included a counterclaim alleging entitlement to attorney's fees under § 4A (*f*) on the grounds that the trustees did not negotiate in good faith and there was no reasonable basis for claiming liability on the part of Thermo Electron and TJA under G. L. c. 21E. However, in their answer to the trustees' amended complaint, Thermo Electron and TJA, this time joined by Fisher Delaware II, Allied, Allied-Signal, and IL Co., did not include any counterclaim requesting relief under § 4A (*f*), or otherwise refer to attorney's fees recoverable under that section. Rather, the defendants only made a generic request for "their costs of defending this action."

Following the jury trial, the judge tried without a jury both the trustees' claim against Fisher Delaware II for litigation costs and attorney's fees under G. L. c. 21E, § 4A (*d*), and the defendants' corresponding claims for such costs and fees under § 4A (*f*). He reserved, however, the threshold question whether some of the defendants' § 4A (*f*) claims were waived because the defendants had not asserted the claims by way of a counterclaim or otherwise in their answers. In his decision following the trial, the judge ruled that all of the defendants, with the exception of Thermo Electron and TJA, were precluded from recovering litigation costs and attorney's fees under § 4A (*f*) because they had not included any counterclaim seeking such relief.[32] He then went on to reach the merits of the § 4A (*f*) claims raised by Thermo

---

[32]In this connection, the judge noted that while he had heard evidence on the merits of the defendants' G. L. c. 21E, § 4A (*f*), claims, they were "not tried by consent . . . : [the trustees] timely made [their] objection to my hearing the claims." On their part, the trustees had specifically set out their corresponding claim against the defendants under § 4A (*d*) for litigation costs

Electron and TJA. He ruled that TJA had failed to establish that the trustees had no reasonable basis to allege liability on its part and therefore TJA was not entitled to an award under § 4A (*f*), but that Thermo Electron was entitled to the award because it was unreasonable for the trustees to assert a claim against it based solely on its status as a parent company. Thereafter, however, the trustees pointed out in a posttrial motion that the answer to the trustees' amended complaint, filed on behalf of all the defendants (including Thermo Electron) in fact did not include such a § 4A (*f*) counterclaim. The trustees' contention was that like the other defendants, Thermo Electron was not entitled to costs and fees under § 4A (*f*) because of a failure to plead. In his memorandum and order on the posttrial motions, the judge agreed, and reversed his ruling in favor of Thermo Electron. Therefore, the judge's ultimate determination was that none of the defendants was entitled to an award of costs and attorney's fees under § 4A (*f*). We agree with the judge's ultimate ruling.

Unquestionably, the defendants' claim to recover litigation costs and attorney's fees represents a claim for relief in the form of a monetary award. Under the Massachusetts Rules of Civil Procedure, a claim for relief is to be set forth in a pleading that contains "(1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief to which he deems himself entitled." Mass. R. Civ. P. 8 (a), 365 Mass. 749 (1974). One purpose of this requirement is to give fair notice of the claim to the parties. See *Lazzaro v. Holladay*, 15 Mass. App. Ct. 108, 110-111 (1983). As the judge pointed out, by the failure to include the § 4A (*f*) claim for litigation costs and attorney's fees in their answer, the defendants "deprived [the trust] of the opportunity to do discovery or other pretrial preparation or motion practice on any factual or legal issues that such a pleading might have raised."

The defendants argue that the denial of their § 4A (*f*) claims solely for a failure to plead "exalted form over substance" and constituted legal error because the plain language of § 4A (*f*) does not require a defendant affirmatively to plead such a claim; in the defendants' view, the judge was adding requirements to

and attorney's fees in a separate count of both their original and amended complaints.

the statute that the Legislature had not seen fit to include. The argument lacks merit.

We fail to understand the significance of the fact that § 4A (*f*) contains no explicit direction to a defendant to plead a claim under that section as a prerequisite for obtaining relief. As a general rule, statutes that authorize or direct the award of attorney's fees do not contain any such language. See, e.g., G. L. c. 12, § 11I (civil rights act); G. L. c. 21E, § 15 (citizen enforcement of environmental protection statute)[33]; G. L. c. 93A, §§ 9, 11 (consumer protection act); G. L. c. 151B, § 9 (antidiscrimination statute); G. L. c. 231, § 59H ("anti-SLAPP" statute). Nonetheless, parties seeking such fees are to include the request in their pleadings. See, e.g., *Fabre* v. *Walton*, 436 Mass. 517, 525 (2002), *S.C.*, 441 Mass. 9 (2004) (in reversing denial of defendant's special motion to dismiss under anti-SLAPP statute, which requires award of costs and attorney's fees if granted, court specifically noted that defendant had included request for costs and attorney's fees in her motion and would be entitled to award of such fees and costs on remand).[34]

Moreover, there is a particular reason for requiring a party seeking an award of litigation costs and attorney's fees under § 4A — whether § 4A (*f*) or § 4A (*d*) — to set out its claim in a pleading. Under most statutory fee-shifting provisions (and all the statutory provisions cited in the previous paragraph), the party bringing the substantive claim may receive an award of costs and attorney's fees directly as a consequence of prevailing on the merits of that claim; the entitlement or authorization is not contingent on proof of any other condition or fact. In contrast, § 4A (*f*) and (*d*) condition an award of litigation costs and attorney's fees on a factual showing, and a resulting finding by the judge, that the party against whom the award of costs and fees is sought has acted in at least one of several specified ways that are

[33]The trustees' claim for attorney's fees and costs under G. L. c. 21E, § 15, is discussed *infra*. The trustees included a specific request for such fees in their amended complaint.

[34]In a related vein, we have held that where a party seeks the award of appellate attorney's fees and costs in a case where a statute has authorized the award of such fees and costs to the prevailing party at the trial level, the party seeking the fees must include the request in the appellate brief. *Fabre* v. *Walton*, 441 Mass. 9, 10 (2004). See *Yorke Mgt.* v. *Castro*, 406 Mass. 17, 20 (1989).

deleterious to settlement of the underlying response action.[35] Contrary to the defendants' claim that an award of costs and fees under § 4A (*f*) is "self-effectuating," the requirement that the judge make factual findings as a prerequisite to such an award leads inexorably to the conclusion that one of the parties to the litigation present the court with evidence on which such findings could be based. Because the defendant is the party seeking the award, it follows that the defendant should bear the burden of producing the necessary evidence. Basic rules of civil pleading and practice require, however, that in such circumstances, the opposing party receive fair notice of the nature of the defendant's claim and the evidence that supports it. The fundamental way that such notice is initiated is through pleadings. Cf. *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 471 (1991) (failure to plead affirmative defense results in waiver of that defense).

The defendants also contend that by permitting the trustees to avoid a fee award against them based only on a "procedural technicality," the judge contravened the section's underlying legislative intent to sanction "opprobrious" conduct on the part of response action plaintiffs. The argument mixes apples and oranges. There is little doubt that § 4A (*f*) (and also § 4A [*d*]) reflects a legislative intent to use fee-shifting awards as a sanction for misconduct, in order to encourage parties to negotiate and implement resolutions of environmental cleanup actions without costly and time-consuming litigation. But requiring those parties to abide by generally applicable rules of pleading and procedure when they seek to enforce the sanction does not conflict with this legislative purpose.[36],[37]

7. *The litigation fees.* The trust was awarded litigation fees

[35]Thus, G. L. c. 21E, § 4A (*f*), at issue here, directs that the court shall award costs and fees to the defendant on a specific finding "that (1) the plaintiff did not participate in negotiations or dispute resolution in good faith; (2) the plaintiff had no reasonable basis for asserting that the defendant was liable, or (3) the plaintiff's position with respect to the amount of the defendant's liability . . . was unreasonable."

[36]As has been stated, the judge denied TJA's § 4A (*f*) claim on the merits. On appeal, TJA argues the judge committed error in doing so. We do not need to reach TJA's argument, however, because it is clear that TJA's claim would properly have been denied on the same ground as Thermo Electron's and the other defendants', namely, that TJA failed to plead it.

[37]The defendants' final point about their § 4A (*f*) claims is that at least

and costs under G. L. c. 21E, § 15.[38] Section 15 allows a court to award reasonable attorney's fees and expert witness fees to any party "who advances the purposes of this chapter." This provision authorizes a judge to award attorney's fees and costs to a party that brings suit under G. L. c. 21E, § 4, for reimbursement of response costs as long as that party has not caused or contributed to the release of hazardous materials necessitating its response action. *Martignetti* v. *Haigh-Farr, Inc.*, 425 Mass. 294, 319-321 (1997). Because the jury found that the trust did not cause or contribute to the contamination, the judge's award under § 15 was warranted.

Fisher Delaware II argues[39] that the trustees did not advance the purposes of the statute because they (1) pursued claims against a number of defendants against which they knew they had no reasonable claim and relied on facts which they knew to be false; (2) rejected settlement offers made during litigation; and (3) conducted a response action that was unreasonably delayed and that violated the MCP. Fisher's argument is without merit. All that G. L. c. 21E, § 15, requires is that a plaintiff has sought reimbursement under G. L. c. 21E, § 4, and has not contributed to the hazardous waste release. *Martignetti* v. *Haigh-Farr, Inc.*, *supra* at 321, 323-324. The statutory prerequisites for recovery under § 4 are that the plaintiff give sufficient notice to the defendants, § 4A (*a*); participate in negotiations in good faith,

---

Thermo Electron and TJA adequately put the trustees on notice that they were seeking costs and fees under the section, by referencing the claim in their response to the plaintiffs' § 4A demand letter, and later by including a specific counterclaim for costs and fees under § 4A (*f*) in their answer to the original complaint. In the circumstances, they contend, the judge's denial of their § 4A (*f*) claims for lack of pleading is particularly unjustified. We disagree. The inclusion of a § 4A (*f*) counterclaim in these two defendants' original answer, followed by an answer to the amended complaint that includes no such counterclaim and no reference to § 4A (*f*) — all occurring while these defendants were represented by competent and sophisticated counsel — might reasonably be interpreted as an intentional abandonment or waiver of the § 4A (*f*) claim.

[38]The judge also awarded litigation costs and attorney's fees to the trust under G. L. c. 21E, § 4A (*d*). Because we conclude that the trustees are entitled to the fees awarded by the judge under § 15, we need not decide whether they are entitled to the identical fees under § 4A (*d*).

[39]Because Fisher Delaware II was the only party found responsible under G. L. c. 21E, § 4 (*f*), it is the only party required to pay under § 15.

§ 4A (*b*); and conduct a necessary and appropriate response action in accordance with the MCP, § 4, second and third pars.

The jury's findings in this case established that the trustees conducted a necessary and appropriate response action in accordance with the MCP, and that the trust was not responsible for causing the contamination. None of the alleged defects cited by Fisher Delaware II would result in a violation of the two remaining prerequisites of notice and good faith negotiation. The allegedly false statement cited by Fisher Delaware II, found in the trustees' § 4A letter, indicated that it was the trustees' understanding "that [TCE] was used on the site from 1964-1988." During his testimony Richard Rudman, the lawyer responsible for drafting the letter, admitted that the dates were a drafting error, and that the letter should have said "1964-1986." Although the error suggested that the release of TCE might have occurred during TJA's tenancy, it does not amount to bad faith negotiation or insufficient notice. Fisher Delaware II also argues that the trustees pursued manifestly unreasonable theories of corporate parent liability against IL Co., Thermo Electron, and Allied. Yet even if such theories were unreasonable with respect to IL Co., Thermo Electron, or Allied, they could have had no harmful effect on Fisher Delaware II. Fisher Delaware II's last argument is that the final offer made during litigation, for $917,000, was for $200,000 more than the jury's verdict, and the trustees' failure to accept that offer means that Fisher Delaware II should not bear any costs of litigation incurred after that offer was made.[40] The offer in question was made during litigation, and thus cannot contribute to a finding of bad faith in the pretrial negotiation process required by § 4A. The trustees "advanced the purposes of the statute," and therefore the judge's award was justified.[41]

8. *Jurisdiction.* The defendants argue that the trustees' failure

---

[40]While the jury eventually awarded the trustees $719,484.20 on the § 4 claim, that amount did not include interest or litigation fees, and $600,000 of which was to be paid over time without security. With interest, the jury award totaled $1,245,887.80, with fees and costs added in, the award is obviously much higher. (See note 41, *infra*.)

[41]There is no question raised about the amount of fees awarded to the trust: the parties commendably stipulated to the reasonableness of the amount, while reserving arguments about the propriety of making an award. The fees awarded to the trustees were $1,100,000.

to propose an equitable share of the response costs, together with the alleged false or misleading statements made in the § 4A letter, deprived the Superior Court of jurisdiction over the trustees' claims. The defendants cite § 4A (*c*), which provides that a party may commence a civil action under § 4A "[o]nly after notice has been given and after the procedures described in this section have been carried out . . . ." G. L. c. 21E, § 4A (*c*). Those procedures include the requirement that the § 4A letter state each recipient's "proposed contribution, reimbursement or equitable share" of liability. G. L. c. 21E, § 4A (*a*). The alleged defects cited by the defendants do not deprive the Superior Court of jurisdiction. Minor inaccuracies, omissions, and errors in the contents of the § 4A letter cannot bar jurisdiction when all other procedural requirements of § 4A are complied with. See *Rudnick v. Hospital Mtge. Group, Inc.*, 951 F. Supp. 7, 9 (D. Mass. 1996) ("when a party gives . . . actual notice, section 4A [*a*] is not a jurisdictional bar to commencement of an action").

9. *Environmental report.* The defendants' final argument is that an environmental report commissioned by the trust was erroneously admitted in evidence over the defendants' objections. The report contained a speculative assertion that an aboveground storage tank was the probable source of the TCE contamination. Fisher Delaware II contends that the report suggested that it was responsible for the contamination because it was Fisher Delaware II (and its corporate predecessors) that operated the aboveground storage tank. According to this argument, the report was highly prejudicial, should not have been admitted for any purpose, and its admission was an error requiring a new trial. "Relevant evidence is admissible unless unduly prejudicial, and, '[i]n weighing the probative value of evidence against any prejudicial effect it might have on a jury, we afford trial judges great latitude and discretion, and we uphold a judge's decision in this area unless it is palpably wrong.' " *Commonwealth* v. *Arroyo*, 442 Mass. 135, 144 (2004), quoting *Commonwealth* v. *Sicari*, 434 Mass. 732, 752 (2001), cert. denied, 534 U.S. 1142 (2002). Here, the report was relevant to show that the trust was complying with the MCP, as well as to establish the amount of the response costs sought by the trustees. It was admitted with a limiting instruction that it was to be considered not for the truth

of the matters asserted within it, but rather to show that it had been prepared and that the trustees were notified of its contents. That decision was well within the judge's discretion.

10. *Conclusion.* That portion of the amended judgment relating to the trustees' claims under G. L. c. 21E, §§ 4 and 15, is affirmed. The entry of judgment n.o.v. on the trustees' contract claim is vacated and the case is remanded for the entry of a judgment based on the jury's verdict on that claim.[42]

*So ordered.*

---

[42]The trustees have requested an award of attorney's fees and costs related to this appeal, pursuant to G. L. c. 21E, § 15. They are authorized to seek such an award by filing with the court a request for fees and costs within fourteen days of the issuance of the rescript from this court, in accordance with the procedure set forth in *Fabre* v. *Walton,* 441 Mass. 9, 10-11 (2004). Fisher Delaware II will be given fourteen days thereafter to respond.